STANLEY S. PICKETT ET AL. *v.* PRINCE GEORGE'S COUNTY, MARYLAND ET AL.

[No. 27, September Term, 1981.]

*Decided October 28, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*R. Calvert Steuart* for appellants.

*Valerie J. Monaghan, Associate County Attorney* and *Robert B. Ostrom, County Attorney,* with whom were *Michael O. Connaughton, Deputy County Attorney,* and *Ralph E. Grutzmacher, Associate County Attorney,* on the brief, for appellee Prince George's County and by *Ronald Willoner* for appellee Board of Election Supervisors. *David Bird* on the brief for other appellees.

SMITH, J., delivered the opinion of the Court.

In this declaratory judgment action, three issues are presented: (1) the alleged invalidity of a petition by way of initiative for an amendment to the charter of Prince George's County; (2) the question of whether that charter amendment impaired contract rights of bondholders so as to be a violation of their rights under United States Constitution Art. 1, § 10, cl. 1; and (3) whether the Board of Election Supervisors of Prince George's County properly performed its duties upon presentation to it of the petition proposing the charter amendment. In the view we take of the first question, we have no need to address the third. We shall affirm the judgment of the Circuit Court for Prince George's

County, which determined that the charter amendment had been validly adopted and that there was no impairment of contract rights.

### i The case

Maryland Constitution Art. XI-A, § 5 provides that amendments to charters of home rule counties may be proposed "by a petition signed by not less than 20% of the registered voters of the . . . County, provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition." [1] Prince George's County adopted home rule in 1970.

In August 1978, a group calling themselves "the Tax Reform Initiative by Marylanders" delivered a proposed amendment to the charter of that county to the County Executive of Prince George's County. This was pursuant to Prince George's County Charter § 1105 and Maryland Code (1957, 1976 Repl. Vol., 1977 Cum. Supp.) Art. 33, § 23-1. (From the name of the group came the acronym "TRIM." Hence, this has become known as the "TRIM Amendment.") The petition appeared to be signed by more than 10,000 registered voters of Prince George's County. The proposed amendment placed restrictions upon the levy of real property taxes.[2] It was duly approved by the voters of Prince George's County at the general election held in 1978.

---

1. For discussion of the proposal in Maryland for initiative and referendum and the deletion of the initiative provisions when the General Assembly adopted what ultimately became Maryland Constitution Art. XVI relative to referendum, see *Tyler v. Secretary of State,* 229 Md. 397, 403, 184 A.2d 101 (1962).

2. The text of the amendment is as follows:

"(a) The Council shall not levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979;

"(b) In the event that any annual collection of real property taxes exceeds the limits set forth in this section as estimated in the annual budget projections, said excess shall be placed in the contingency fund, and if not used during the current fiscal year, said excess will be included in the budget estimate for real property taxes in the following fiscal year;

"(c) In the event the County Council shall establish, pursuant to proper authority, any separate class of residential real property

On September 4, 1979, about ten months *after* the election, the appellants instituted a declaratory judgment action in the Circuit Court for Prince George's County. The allegations of their petition included that they were "holders of Prince George's County General Obligation Bonds . . . ." They challenged the "TRIM Amendment" on two bases: (1) that it impaired their contract rights, and (2) that it was improperly adopted because it "was placed on the ballot . . . in a manner not in compliance with the requirements imposed by the Constitution of Maryland, Article XI-A, Section 7 in that the petitions submitted failed to provide the ward, district and precinct of the registered voter signing the petition." No contention has been presented that any fraud or other irregularity was involved. The matter ultimately came on for hearing upon motion for summary judgment. Summary judgement was entered in favor of the County and the Board of Election Supervisors. Certain other parties were dismissed.

The appellants petitioned us for the writ of certiorari prior to hearing of the matter in the Court of Special Appeals. We granted that petition to address the important public issues here presented.

### ii Validity of the petition

Constitution Art. XI-A, § 7 provides that a petition to amend the charter of a home rule county is to contain "the ward or district and precinct in which [each signer] is registered." [3] It is conceded that the petitions did not contain information as to the ward or district and precinct of the signers.

---

tax, then, and in that event, all other classes of real property taxes would be exempt from this section, and the total real property taxes on residential real property shall not exceed the total amount of taxes collected on residential real property in fiscal year, 1979."

**3.** The text of § 7 is as follows:

"The word 'Petition' as used in this Article means one or more sheets written or printed, or partly written and partly printed; 'Signature' means the signature of a registered voter written by himself in his own handwriting (and not by his mark), together

This Court has been consistent in applying a different standard for review after election from that applied before election. *See, e.g.,* the discussion for the Court by Judge Hammond in *Dutton v. Tawes,* 225 Md. 484, 491-92, 171 A.2d 688, *appeal dismissed and cert. denied,* 368 U.S. 345 (1961). However, the appellants rely upon the fact that this is a constitutional provision and point to language such as that in *Baltimore & D.P.R.R. v. Pumphrey,* 74 Md. 86, 112, 21 A. 559 (1891), where Chief Judge Alvey said for the Court, "And to hold that the terms, as employed in the Constitution, are merely directory and not mandatory, as contended by the defendant, would not only be introducing a lax rule of construction of the Constitution, but such construction would virtually nullify and destroy a valuable safeguard intended as means of bringing to the notice and consideration of the people to be affected, contemplated burdens upon them and their property." That statement must be placed in its proper context. It may be helpful, therefore, to review not only that case but others of our cases.

In that case (*"Drum Point"*), the Court was concerned with whether there had been compliance with the provisions of

---

with the ward or district and precinct in which he is registered. The authenticity of such signatures and the fact that the persons so signing are registered voters shall be evidenced by the affidavit of one or more registered voters of the . . . County in which said voters so signing are registered, and one affidavit may apply to or cover any number of signatures to such petition. The false signing of any name, or the signing of any fictitious name to said petition shall be forgery, and the making of any false affidavit in connection with said petition shall be perjury."

It must be remembered that what we know today as "permanent registration" did not exist at the time of the adoption of § 7 at the general election of 1915. Today, Code (1957, 1976 Repl. Vol.) Art. 33, § 3-11 (a) provides that each Board of Election Supervisors shall keep "duplicate [registration] forms . . . filed in filing cases or loose-leaf binders arranged for the entire . . . county . . . in alphabetical order . . . ." This greatly facilitates the task of verification. At the time of the adoption of the constitutional amendment, two registry books (one for the registrar of each of the major parties) were provided for each polling place. To verify whether the signer of a petition was registered, one would have had to check the registry book for the signer's polling place. Thus, it would have been important to know his "ward or district and precinct in which he [was] registered." *Compare* Code (1912) Art. 33, §§ 15-17 *with* Code (1957, 1976 Repl. Vol.) §§ 3-1 to -13.

Constitution Art. III, § 54 as it then stood. It required that before a county might assist financially in the construction of a railroad there had to be authority from the General Assembly together with certain published notice.[4] Immediately after that which we have quoted from *Drum Point* and which is cited by the appellant, the Court said:

> "For if the constitutional requirement be held to be directory only, the publication might be for half the time prescribed, or it might be omitted all together, and yet the power would be effective. This was never the design of the constitutional provision; and therefore all the conditions prescribed should be strictly observed; they are all equally essential to the authority attempted to be conferred. Or, as said by the Supreme Court, in *Young v. Clarendon,* 132 U.S. [340,] 349 [(1889)], 'they are of equal importance under the law, and one cannot be dispensed with more than another. Neither is directory, but all are mandatory.' The question is not what, in the absence of a constitutional restriction, would constitute a valid legislative grant of power, but what the Constitution itself requires; and as the two months publication of the Act of 1872 was essential as one of the conditions precedent to a valid confirmatory Act, and that publication was not duly made, as required by the constitutional provision, all the constitutional requirements were not complied with, and

---

4. The text of the section in question read in its entirety:

"No County of this State shall contract any debt, or obligation, in the construction of any Railroad, Canal, or other Work of Internal Improvement, nor give, or loan its credit to, or in aid of any association, or corporation, unless authorized by an Act of the General Assembly, which shall be published for two months before the next election for members of the House of Delegates in the newspapers published in such County, and shall also be approved by a majority of all the members elected to each House of the General Assembly at its next Session after said election."

This section was mentioned for the Court by Judge Boyd in *Bonsal v. Yellott,* 100 Md. 481, 503-04, 60 A. 593 (1905). That case was concerned with Constitution Art. III, § 34. For the background leading to the adoption of such constitutional provisions, see the discussion by Judge Boyd for the Court at 498-99.

therefore there was no legal or valid authority conferred and confirmed by the Acts of 1872 and 1874." 74 Md. at 112-13.

*Dutton,* 225 Md. 484, was a postelection challenge to a referendum relative to Ch. 269 of the Acts of 1959, an act to confirm the compact with the State of Virginia relating to the Potomac River. The employees of the Secretary of State of Maryland published the notice concerning the referred law pursuant to the provisions of an earlier act rather than as required by Ch. 739 of the Acts of 1957. The validity of the compact was challenged for that reason. The Court referred to the large number of votes cast on the proposition ("larger than that cast for and against all but two of the fifteen constitutional amendments voted on at the same time") and to the extensive preelection publicity. It said the latter included the speech by William J. McWilliams (later a member of this Court) which "discuss[ed] exhaustively all of the aspects and particulars of the proposed compact on June 18, 1959, before lawyers from all over the State assembled at Atlantic City for the meeting of the Maryland State Bar Association." In upholding the compact against the challenge, Judge Hammond said for the Court:

> "In factual situations comparable to that before us, courts have supported the upholding of elections despite only partial compliance, or even non-compliance, with modal provisions as to notice or the holding of elections on various grounds. Some have found substantial compliance with statutory requirements, others have said that provisions would be construed as mandatory before election but as directory after the election had been fairly held. The latter reasoning, as we have suggested earlier, may be an imprecise, if not inaccurate, rationalization of what Judge Marbury said for the Court in *Wilkinson v. McGill, supra,* at page 393 of 192 Md., that when an election has been held and it is not shown that the failure of election officials to hew strictly to the statutory line has prevented a

full and fair expression of the will of the voters the Courts will not disturb the result. All of the cases turn fundamentally on whether the mistake in procedure has caused harm by misleading the electorate or by tending to prevent or frustrate an intelligent and full expression of the intent of the voters." *Id.* at 495.

In *Wilkinson v. McGill,* 192 Md. 387, 64 A.2d 266 (1949), an act was not to be effective until submitted to voters at a special election to be held on January 22, 1948. The challenge was based upon an alleged improper registration held on December 20, 1947, and the further fact that the original advertisement called for a polling place in one district which had been used for many years but, when it became unavailable, a bowling alley was used in its stead, with advertisement of that fact. Unfortunately, a prohibition existed against using a bowling alley as a voting place. Chief Judge Marbury said for the Court, "There have been a number of cases in this Court in which irregularities have been asserted to render elections void and the Court has uniformly adopted the construction above set out where the irregularities did not affect the result." 192 Md. at 393. The "construction above set out" was that "[t]here is a clearly recognized difference between the interpretation given to provisions of the election laws before election and the construction of these same provisions after election." *Id.* The Court held relative to the notice and the place of holding election, "[N]one of them are shown to have affected the ultimate result, and, as mere irregularities, they should not be allowed to set aside what the voters have decided." *Id.* at 395. (As to the challenge relative to alleged illegal registration, the Court said the plaintiffs had failed to meet their burden.)

In *Wilkinson,* the Court distinguished *Graf v. Hiser,* 144 Md. 418, 125 A. 151 (1924). The legislative act with which the Court was concerned in *Graf* created a special taxing district in Prince George's County. The notice posted relative to the special election to be held concerning the estab-

lishment of the district, in the words of the Court, "defin[ed] the qualifications of those who would be allowed to participate in the election [in a manner] materially different ... from that prescribed by the statute. It was the plain meaning of the notice actually posted that the franchise should be limited to resident taxpayers, while the act extended it to all who had the qualifications of 'legally registered voters' and who had resided in the district for the period mentioned." *Id.* at 420. The Court pointed out "that there was a serious defect in the notice which the act made a prerequisite to the election at which the question of its ratification or rejection was to be submitted," and that this notice "was not a substantial compliance with that essential condition precedent ...." *Id.* at 421. It held:

> "The inquiry here is whether an act of assembly has become operative. According to its own terms it could take effect only in the event that certain conditions were fulfilled. Those conditions were that a specified notice should be given to the qualified voters of the described district, that an election should be held in pursuance of the notice, and that a majority of the votes cast at such election should be in favor of making the act effective. The charge in this case is not that the election was fraudulent or that the vote was not truly returned, but that an important act which the statute required to precede the election, and without which it could not be validly held, was not properly performed, and that specific directions, as to the basis of voting eligibility upon which the election was to be conducted, were not obeyed." *Id.* at 422.

Thus, it concluded "that the statute in dispute is not in force because the conditions under which it was to become effective have not been satisfied." *Id.* at 423.

Further understanding is obtained when we compare *Graf* with *Carr v. Hyattsville*, 115 Md. 545, 81 A. 8 (1911), yet another postelection challenge. There the legislative enactment required a referendum relative to improvements of

streets. The act required the question printed on the ballot to be "For the Act to Improve the Streets" and "Against the Act to Improve the Streets." What was printed was "For the road bill" and "Against the road bill." Judge Burke said for the Court:

> "The plain purpose of the Legislature was that this act should become effective if approved by a majority of the voters of the special election, and the object of providing the form of ballot was to ascertain the will of the majority of the voters on the question of its approval, and since that majority did approve the act under the form of ballot used, which was substantially, but not strictly, in the words provided in the act, the will of the majority should not be set aside for any of the reasons stated in the bill. The voters undoubtedly knew they were voting upon the question of the approval or disapproval of the act, and having settled that question at a fair election the object which the Legislature had in view has been gratified, and the act should be held to be in full force and effect. This conclusion is supported by what appears to be the great weight of authority in the American Courts." *Id.* at 550-51 (citing cases).

*Accord, Lexington Park v. Robidoux,* 218 Md. 195, 146 A.2d 184 (1958).

*Tyler v. Secretary of State,* 229 Md. 397, 184 A.2d 101 (1962), is a preelection case. There the petition sought to suspend the operation of a statute pending referendum. The Court said:

> "The question raised by this appeal is the effect upon a referendum petition of the falsity, in part, of the statement in the accompanying affidavit of the circulator, made in the form prescribed by Section 4 of Article XVI of the Maryland Constitution, that the signers of the petition were registered voters of the State and County, as set opposite their names." *Id.* at 401.

The Court further stated:

> "The exercise of the right of referendum is drastic in its effect. The very filing of a petition, valid on its face, suspends the operation of any of a large class of legislative enactments and provides an interim in which the evil designed to be corrected by the law may continue unabated, or in which a need intended to be provided for, may continue unsatisfied. [(Citing cases.)]
>
> "We believe that it is clear, in any case, that the stringent language employed in Section 4 of the Article shows an intent that those seeking to exercise the right of referendum in this State must, as a condition precedent, strictly comply with the conditions prescribed." *Id.* at 402 (citing cases).

The Court referred to the history of the constitutional provision relative to referendum, including Maryland's requirement "which exacts of the affiant not merely his belief, but his personal knowledge of the matters to which he makes oath." *Id.* at 404. Maryland was said to be "one of the few jurisdictions" imposing this requirement of personal knowledge. *Id.* The bill of complaint in that case alleged, "among other things, that of the 1,224 separate papers comprising the petition for a referendum filed with the Secretary of State, 761 contained the name of at least one person who was not in fact a registered voter of the State of Maryland and Baltimore County . . . ." In reversing the action of the circuit court and remanding the case for further proceedings, the Court said:

> "We hold . . . that if the circulator of a referendum petition in this State makes affidavit that, of his own personal knowledge, the signers of the petition which he has circulated are registered voters of the State, and the County, as set opposite their names when, in fact, he has no such personal knowledge, the falsity of his affidavit gives rise, at least, to a presumption of fraud. . . . Upon proof of the falsity of the affidavit, the prima facie presumption of the

validity of the petition, or a sheet thereof, ostensibly verified by the affidavit, must fail, along with all the signatures thereon, and the burden is cast upon the proponents of the referendum to affirmatively show that the remaining signatures on such petition or sheet thereof are genuine and bona fide and that the signers are registered voters as required by law. [(Citing cases.)]

"To adopt a more lenient rule ... would, in our opinion, frustrate the intent behind the language of the section discussed. *Newman v. Secretary of the Commonwealth* [, 339 Mass. 749], 162 N.E.2d 291, 293 [(1959)]." *Id.* at 405-06.

*Accord, Ferguson v. Secretary of State,* 249 Md. 510, 240 A.2d 232 (1968), yet another preelection case.

It will be seen from these cases that when the Constitution has prescribed an exact method to be followed before such an important item as incurring a debt by a county for the benefit of others may be accomplished, deviation from the prescribed notice will not be permitted. When the Court considers, prior to an election, an attempt to prevent a statute from going into force by use of a referendum petition, there must be strict compliance with the prerequisite to such suspension. On the other hand, in an effort not to thwart the will of the people, in a postelection challenge, the fact that the question on the ballot referred to improvements of roads rather than streets, that although an election was well publicized the notice was not in the precise manner required, or that some forbidden place such as a bowling alley was used as a polling place will not invalidate the statute under consideration. The evident and only purpose of the constitutional provision was that there be substantial public support for a proposed charter amendment before it was submitted to the voters of a county. The people by their vote have demonstrated that support. Thus, the purpose was satisfied. The challenge here not having come until about ten months after the electorate approved the charter amendment, we have no difficulty in saying the charter amendment was validly adopted.

### iii Impairment of contract

The fear of the appellants here is that because of this charter amendment, the County will fail to levy sufficient taxes to meet its obligations on the bonds held by them. It is undisputed that the bonds were issued upon "[t]he full faith and credit and unlimited taxing power of the County [which was t]hereby pledged. . . ." [5] The County through its attorney took the position that the charter amendment did not affect these bonds. In fact, the record here contains a copy of a letter from the County Attorney to Moody's Investors Service:

> "[I]t is my opinion that Prince George's County Charter, Section 817B, may not be applied to impede or restrict the obligation of the County in regard to obligations which were existing prior to the effective date of Section 817B of the Charter; and that the amendment would not prevent the County from raising sufficient revenues by a levy on assessed real and personal property in excess of the constant yield limitation of Section 817B in order to pay the principal and interest on the prior outstanding bonds, if such remedy were necessary to avoid default, a revenue shortfall, or expected revenue shortfall."

We start with the fact that the validity of a charter provision is presumed since the presumption applicable to any regularly adopted law is equally applicable to a county charter. *Ritchmount Partnership v. Board*, 283 Md. 48, 64, 388 A.2d 523 (1978); *Harford County v. Schultz*, 280 Md. 77,

---

**5.** The record does not tell us precisely when these bonds were issued, but we point out that § 827 of the Prince George's County charter relative to bond issue authorization ordinances provides that such an ordinance shall contain "a declaration that the principal of and the interest on the proposed issue are to be paid by *ad valorem* taxes on real estate and tangible personal property and intangible property subject to taxation by the County without limitation or [sic] rate or amount, and in addition, upon such other intangible property as may be subject to taxation by the County within limitations prescribed by law, except for self-liquidating bonds; and that the full faith and credit of the County are pledged to such payments."

85, 371 A.2d 428 (1977); and *Wilson v. Bd. of Sup. of Elections,* 273 Md. 296, 300-01, 328 A.2d 305 (1974).

The fears of the appellants here are without foundation for two reasons. The first is the well-understood principle of law that if there are two constructions that can be placed upon a constitutional provision, a statute, or an act of a public official, one of which will result in its legality and effectiveness and the other of which will make it illegal or nugatory, we must construe it so as to render it effective and so as to avoid conflict with the Constitution whenever that course is reasonably possible. *See, e.g., Moss v. Director,* 279 Md. 561, 566, 369 A.2d 1011 (1977); *Perkins v. Eskridge,* 278 Md. 619, 640, 366 A.2d 21 (1976); *Moberly v. Herboldsheimer,* 276 Md. 211, 217, 345 A.2d 855 (1975); *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975); *Wilson,* 273 Md. at 301; and *District Land v. Wash. S.S.C.,* 266 Md. 301, 312, 292 A.2d 695 (1972). To hold that the charter provision here was intended to be prospective in its application would avoid any question of impairment of the contract rights of the appellants.

The second reason for holding that the charter provision is not applicable to bonds of Prince George's County issued before the effective date of the charter amendment is that Code (1957, 1976 Repl. Vol., 1981 Cum. Supp.) Art. 31, § 2D (a), enacted by Ch. 796 of the Acts of 1980 and applicable by its terms to Prince George's and Anne Arundel Counties, provides that "[a] present or future provision of the charter of [those counties] that requires or has the effect of requiring that such county pledge its unlimited taxing powers, either as to the rate or amount, for the repayment of its indebtedness, shall not be given effect if any other provision of the charter of that county adopted after the provision thereof requiring such pledge is inconsistent with such pledge." Section 2D further provides in subsection (c):

"No charter provision of Prince George's County or Anne Arundel County shall impair or be construed to impair the obligation of such county to levy and collect taxes to provide for the payment when due of principal of and interest on bonds of

> such county, or bonds guaranteed by such county, to which that county has pledged its unlimited taxing power, and which are outstanding on the effective date of such charter provision."

According to (d), subsection (a) is applicable to all bonds issued by Prince George's or Anne Arundel County prior to June 30, 1981. A well-known rule of law is that appellate courts decide cases according to then existing laws in the absence of some impairment of constitutional rights by a subsequent enactment, which obviously does not exist here relative to Art. 31, § 2D. *See* the cases collected, cited and discussed in *McClain v. State,* 288 Md. 456, 464, 419 A.2d 369 (1980). By the clear provisions of Art. 31, § 2D, the charter amendment here is not applicable to the bonds of the appellants. Thus, there can be no impairment of their contract rights.

*Judgment affirmed; appellants to pay the costs.*