605 A.2d 91
**Edna GRANAHAN et al.**
v.
**PRINCE GEORGE'S COUNTY.**
**No. 68, Sept. Term, 1991.**
Court of Appeals of Maryland.
April 24, 1992.

Rodowsky, J., dissented and filed opinion in which Eldridge and McAuliffe, JJ., joined.

**348**

Robert P. Slaby, Crofton, and Carol B. O'Keeffe (Levan, Schimel, Richman, Belman, Abramson & Scanlan, PA) Columbia, all on brief, for petitioners.

Michael O. Connaughton, Deputy County Atty. (Michael P. Whalen, County Atty., Upper Marlboro,) both on brief, Roger D. Redden (Piper & Marbury) Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case involves a real property tax rate limitation imposed by a county charter provision, and whether it restricts the county's authority to exceed that limitation in order to service the debt incurred on its general obligation bonds issued prior to the enactment of the charter provision.

## I.

Prince George's County, Maryland is organized as a charter county pursuant to Article XI–A of the Constitution of Maryland. By § 817A of the charter, the County is required to "levy ... the amount of taxes required by the budget ... so that the budget shall be balanced as to proposed income and expenditures."

In August, 1978, a group calling itself "The Tax Reform Initiative by Marylanders" proposed an amendment to the Prince George's County Charter. From the name of the group came the acronym "TRIM" and, upon enactment and

ratification of the proposed amendment in 1978, it became known as the "TRIM Amendment" (TRIM I). *See Pickett v. Prince George's County,* 291 Md. 648, 650, 436 A.2d 449 (1981). The amendment added § 817B to the charter; it provided, in subparagraph (a), that the County Council "shall not levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979." At that time, § 827 of the charter required that the County, in its bond issue authorization ordinances, pledge its "full faith and credit" to the payment of the bonds and that, to this end, it would raise the necessary monies by *ad valorem* taxes on real estate "without limitation of rate or amount." [1]

Prior to the enactment of § 817B(a) (TRIM I), the County had issued general obligation bonds to finance capital projects. To avoid a potential conflict between the limitation imposed by § 817B(a) upon the total authorized collection of real property taxes, and § 827's pledge of the County's full faith and credit to the payment of the bonds without limitation as to rate or amount, the General Assembly of Maryland, effective June 1, 1980, enacted what is now codified as Maryland Code (1990 Repl.Vol.), Article 31, § 2D, a public general law which prevails over any contrary charter provision. This section provided in subsection (a) that "[a] present or future provision ... [of a county charter] that requires ... that such county pledge its unlimited taxing powers, either as to [the] rate or amount, for the repayment of its indebtedness, shall not be given effect if any other provision of the charter of that county adopted after the provision thereof requiring such pledge is inconsistent with such pledge." By subsection (d) of § 2D, the provisions of subsection (a) were made applicable "to all bonds issued by Prince George's County ... prior to June 30, 1981."

---

1. Section 827 of the charter was amended, effective November 4, 1980, by deleting the requirement that the County pledge real estate taxes to the payment of the bonded indebtedness "without limitation of rate or amount."

It was also provided in § 2D(c) that no charter provision in Prince George's County "shall impair or be construed to impair the obligation of such county to levy and collect taxes to provide for the payment ... [of] bonds of such county ... to which that county has pledged its unlimited taxing power, and which are outstanding on the effective date of such charter provision." Section 2D(b) specifies that "[f]or the purpose of providing security for the payment of the [bonds]," the borrowing county, by charter provision or by legislative act, may

"provide for the creation of sinking funds, debt service funds, debt service reserve funds, or other trust funds, including funds held by a corporate trustee, pledged for such payments, (2) ... provide that, in the event that sufficient funds for the timely payment of said principal and interest when due are not available or in the event of a default in the payment of said principal or interest, the first general fund revenues of that county received thereafter shall be applied to the payment thereof in amounts sufficient to make such payment when due or to cure such default as the case may be, and (3) ... pledge any of its revenues to the payment of said principal and interest to the extent provided by said charter provision or legislative act."

In 1984, § 817B of the charter was amended by adding a new subparagraph (a)(2). This amendment (TRIM II) provided that the County Council

"may levy a real property tax which would result in a total collection of real property taxes greater than the amount collected in fiscal year 1979 if the real property tax rate does not exceed Two Dollars and Forty Cents ($2.40) for each One Hundred Dollars ($100.00) of assessed value."

In March, 1991, the County Executive for Prince George's County submitted the Fiscal Year 1992 Proposed Current Expense Budget to the County Council. The anticipated revenues and proposed expenditures contained in the budget resulted in the imposition of a real property tax levy of

$2.48 per $100.00 of assessed value of real property. The section of the budget entitled "Budget Highlights" provided that "[t]he current tax rate of $2.40 per $100.00 of assessed value will be maintained as support for the General Fund. An additional $.08 per $100.00 of assessed value will be levied to retire Pre–TRIM debt."

On April 3, 1991, Sharon Baker, a property owner and taxpayer in Prince George's County, filed a declaratory judgment and injunction action against the County. She alleged that the proposed levy of $2.48 per $100.00 of assessed value was an illegal tax because it exceeded the maximum rate allowed by § 817B(a)(2) (TRIM II).

On May 17, 1991, the Circuit Court for Prince George's County (Woods, J.) held that the County had the authority to levy the necessary tax for the payment of pre-TRIM bonds in addition to the levy of $2.40 per $100.00 of assessed value permitted by § 817B(a)(2). It held that "to apply the TRIM Amendment, § 817B of the County Charter, retroactively, . . . would constitute impairment of contractual rights . . . in violation of the United States Constitution." It said that the County "is not restricted to the property rate of $2.40 per $100.00 of assessed value should the levying of the maximum rate produce insufficient funds to pay the debt service on the pre-TRIM bonds." The court concluded that the County need not justify its decision to enact the additional $.08 tax assessment because there was no requirement that it include, in the $2.40 property tax rate, "the funding for the retirement of the pre-TRIM obligations." As to this, the court said that the $2.40 property tax rate limitation imposed by TRIM II was not applicable to the bond obligations incurred by the County prior to the enactment of that amendment to the charter. Relying upon *Pickett v. Prince George's County, supra,* the court held that the TRIM Amendment was prospective in its application and therefore did not restrict the County's authority to impose the additional $.08 per $100.00 assessment applicable to the pre-TRIM bond obligations. The TRIM II limitation, it said, applies only to those obligations

incurred after its enactment, and thus the County was under no duty to include the pre-TRIM debt service in the $2.40 limitation. The court thus declared that the County was authorized to levy the $.08 real property tax to service the pre-TRIM general obligation bonds in addition to the $2.40 levy necessary to meet the post-TRIM obligations and expenses for support and maintenance of the county government.

Baker appealed to the Court of Special Appeals; at the same time, the County filed a petition for certiorari, which we granted, asking that we expeditiously decide the matter prior to decision by the intermediate appellate court.

## II.

Baker argues that TRIM II places an absolute and mandatory restriction on the real property tax rate which may be levied. Thus, she says that the $2.48 tax rate proposed by the County Executive for FY '92, and adopted by the County Council, illegally imposed an additional $.08 in excess of the maximum rate of $2.40 per $100.00 assessed value. Baker contends that it does not matter that failure to increase the tax rate over the § 817B(a)(2) (TRIM II) limitation would have a deleterious effect on County finances. She claims that the only remedy is a charter amendment of the tax rate limitation in § 817B.

Baker next argues that to apply the TRIM II amendment retroactively would not, contrary to the lower court's decision, unconstitutionally impair the contract rights of pre-TRIM bondholders in violation of the Federal Constitution, Article I, § 10, clause 1.[2] Baker says that the framers of the constitutional provision were concerned with the possibility that contract obligations, once assumed, might later be legislatively altered due to financial or political exigencies of the day. She acknowledges that recent Supreme

---

**2.** This provision specifies that "[n]o State shall … pass any … Law impairing the Obligation of Contracts."

Court cases have retreated from the doctrine that the contract clause stands as an absolute bar to the subsequent modification of a state's financial undertakings. These cases, Baker suggests, recognize that an impairment of preexisting contract rights may be upheld if the impairment is reasonable and necessary to accomplish an important public purpose.

Baker draws attention to *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), stating that the Supreme Court there held that a retroactive repeal of a statutory covenant which was intended as security for purchasers of bonds unconstitutionally impaired a contractual obligation, although the bonds affected were not in default; that the statutory covenant was intended as a deliberate form of security intended to increase the marketability of the bonds; and that repeal of the statute would have a negative effect on the financial viability of the bonds as a financial investment.

According to Baker, these cases do not support the County's argument that the application of § 817B(a)(2) to pre-TRIM bonded indebtedness would similarly impair the bondholders' security in the form of the County's pledge of its "unlimited taxing powers" to payment of the bonds. While conceding that the language of the pre-TRIM pledges, and the subsequently enacted tax rate restrictions of § 817B seemingly are at odds, Baker says that more than a simple technical impairment is required to violate the contract clause. Instead, in ascertaining whether a contract clause violation has occurred, Baker maintains that it was important in *United States Trust*, not only that an outright repeal of a statutory covenant "totally eliminated an important security provision," but also that "the covenant was [not] merely modified or replaced by an arguably comparable security provision." 431 U.S. at 19, 97 S.Ct. at 1516.

Baker acknowledges that the TRIM II tax rate restriction, viewed in isolation, may arguably impair the rights of pre-TRIM bondholders. But she says that that determination could in no event be made in light of the statutory

provisions of Article 31, § 2D of the Code. This section, according to Baker, eliminated any possibility that the County may invoke § 817B to avoid its contractual obligations to the pre-TRIM bondholders. In this regard, Baker asserts that, as to the County's contractual obligations to pre-TRIM bondholders, § 2D removes any possible taint of illegality from the provisions of § 817B(a)(2) in that it provides them with comparable replacement security for their investment.

This is so, Baker claims, because under § 2D, the County is authorized to treat all debt service requirements as a first and prior claim on all monies of the General Fund of the County; thus, if the $2.40 tax rate was insufficient to produce funds to pay the pre-TRIM debt service, the County would be obliged to raise the necessary funds under its general taxing powers. This is not to say, according to Baker, that application of the $2.40 tax rate to the entire fiscal year 1992 budget, including payment of pre-TRIM bonded indebtedness, would in any way impair the rights of these bondholders. On the contrary, Baker says that the evidence adduced before the lower court showed that the TRIM II $2.40 tax rate clearly produces sufficient funds to pay principal and interest on all of the County's bonded indebtedness. Moreover, Baker observes that § 2D(c) not only expressly provides that these obligations may not be impaired, but removes "the specter of an unconstitutional impairment" by establishing "a mandatory statutory scheme to repay pre-TRIM bonded indebtedness which sufficiently replaces the 'unlimited taxing power' of the County provided as security in pre-TRIM bond authorization ordinances." It is thus argued that the County cannot invoke the contract clause of the federal constitution as legal authority to exceed the TRIM II tax limitation.

Baker next contends that the trial court was in error in concluding that our 1981 decision in *Pickett v. Prince George's County, supra,* authorized the County to levy a real property tax in excess of the TRIM II tax rate limitation to service the pre-TRIM bonds. She says that the

purpose of TRIM II was to place a permanent cap of $2.40 on real property taxes and that it applied to all current debts of the County, including the payment of principal and interest on both pre- and post-TRIM bond issues. According to Baker, *Pickett* stands for the proposition that a statute will not be applied retroactively if it would cause the statute to violate a constitutional provision. She argues that *Pickett* did not hold that bondholders' rights were actually impaired by the TRIM I Amendment because such a result was precluded by the provisions of § 2D of Article 31.

Finally, Baker asserts that only if the application of the $2.40 maximum tax rate produces insufficient revenues to pay the debt service on pre-TRIM bonds is the County relieved of its obligation to comply with the dictates of § 817B(a)(2). As to this, Baker again emphasizes that an examination of the FY '92 budget reveals that the $2.40 rate will produce revenue far in excess of the amounts necessary to pay all of the debt service on all County bonded indebtedness, including the pre-TRIM debt. Consequently, she argues that the County is fully able to comply with the $2.40 tax restriction without in any way impairing its obligation to pay the principal and interest on the pre-TRIM debt.

### III.

In *Pickett v. Prince George's County, supra,* we considered the restrictions upon the levy of real property taxes imposed by § 817B(a) of the charter (TRIM I); that charter provision prohibited the County Council from levying a real property tax "which would result in a total collection of real property taxes greater than the amount collected in FY '79." In that case, holders of Prince George's County general obligation bonds claimed that the TRIM Amendment unconstitutionally impaired their contractual rights in violation of the contract clause of the federal constitution. The court noted the bondholders' argument that the application of the TRIM Amendment could result in the failure of

the County to levy sufficient taxes to meet its obligations on the bonds held by them. Under then existing § 827 of the charter, the bonds had been issued upon the full faith and credit and unlimited taxing power of the County. The County argued that the charter amendment did not affect these bonds, and it relied upon an opinion of the County Attorney "that the amendment did not prevent the County from raising sufficient revenues by a levy on assessed real and personal property in excess of the constant yield limitation of § 817B in order to pay the principal and interest on the prior outstanding bonds, if such remedy were necessary to avoid default, a revenue shortfall, or expected revenue shortfall."

We found no merit in the argument advanced by the bondholders in *Pickett.* We grounded our decision on "the well-understood principle of law that if there are two constructions that can be placed upon a constitutional provision, a statute, or an act of a public official, one of which will result in its legality and effectiveness and the other of which will make it illegal or nugatory, we must construe it so as to render it effective and so as to avoid conflict with the Constitution whenever that course is reasonably possible." 291 Md. at 661, 436 A.2d 449. We, therefore, held that the TRIM I Amendment "was intended to be prospective in its application," thus avoiding any question of impairment of the contract rights of the bondholders. *Id.* In concluding that TRIM I was not applicable to bonds issued before the amendment's effective date, we also relied upon Article 31, § 2D of the Code. We observed that subparagraph (a) of that statute provided that a present or future charter provision that requires that Prince George's County pledge its unlimited taxing power for the payment of its bonded indebtedness could not be given effect if it was inconsistent with another charter provision adopted after the charter provision which required the unlimited pledge. We next referred to the provisions of § 2D(c), which mandated that no charter provision in Prince George's County should be construed to impair the County's obligation to

impose taxes to provide for the payment of principal and interest on the bonds concerning which the County "pledged its unlimited taxing power, and which are outstanding on the effective date of such charter provision." Finally, we noted that, according to § 2D(d), subsection (a) is applicable to bonds issued prior to June 30, 1981. In view of these statutory provisions enacted by the General Assembly, we held that the TRIM Amendment did not apply to the pre-TRIM bonds involved in *Pickett* and, consequently, there was no impairment of the bondholders' contractual rights.

We think *Pickett* is dispositive of the issue now before us, namely, whether the tax limitation of § 817B(a)(2) applies to the FY '92 budget payment of principal and interest due on the pre-TRIM bonds. We thus adhere to our holding in *Pickett* that, as a matter of statutory construction, the TRIM II limitation does not apply to pre-TRIM bonds. In this regard, our cases hold that, as a general rule, legislative enactments are presumed to operate prospectively and are to be construed accordingly. *See WSSC v. Riverdale Fire Co.*, 308 Md. 556, 560–61, 563–64, 520 A.2d 1319 (1987). The presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary; and, even where permissible, retrospective application is not found except upon the plainest mandate in the legislation. *Id.* at 561, 520 A.2d 1319. As we said in *Riverdale*, the rationale underlying the general rule "provides that retrospective application, which attempts to determine the legal significance of acts that occurred prior to the statute's effective date, increases the potential for interference with persons' substantive rights." *Id.* In other words, "a statute, even if intended to apply retrospectively, will not be given that effect if it would take vested rights, deny due process, or violate [a constitutional provision]." *Id.* at 564, 520 A.2d 1319 and cases there cited.

Neither the TRIM I nor TRIM II Amendments clearly manifested a retroactive intention on the part of the drafters of these charter provisions. Nothing in either of them

purports in any way to afford retrospective effect to their provisions. To afford retroactive effect to these amendments would produce "that kind of interference with substantive rights, whether or not the interference is of constitutional magnitude, [which] is to be avoided." *Riverdale*, 308 Md. at 569, 520 A.2d 1319. Moreover, our 1981 holding in *Pickett*, declining to apply the TRIM I Amendment retroactively, was well known when, in 1984, TRIM II was enacted by the County Council and ratified by the people. There is nothing in the language of TRIM II to suggest any intention as to retrospectivity different from that afforded to TRIM I. And, as we observed in *Riverdale*, 308 Md. at 568, 520 A.2d 1319, "when the General Assembly intends a statute to have a retrospective application, it knows how to express that intent."

That the General Assembly had a similar view of the nonretroactivity of TRIM I and II is evident from the provisions of § 2D of Article 31. The purpose clause (the Title) of that statute (ch. 796 of the Acts of 1980) states that it limits the effect of any provision in the Prince George's County charter with respect to the pledge of its unlimited taxing power to the payment of its bonds, but makes that limitation inapplicable to "borrowings that occurred prior to the effective date of such charter provision." Section 2D(a), on its face, is plainly prospective in application and subsection (d) makes clear that the prospective effect of § 2D(a) applies "to all bonds issued by Prince George's County ... prior to June 30, 1981." And subsection (c) of the statute makes clear that no charter provision for Prince George's County shall impair the County's obligation to levy taxes to pay that part of its bonded indebtedness as to which it "pledged its unlimited taxing power, and [as to] which [bonds] are outstanding on the effective date of such charter provision."

Accordingly, having carefully considered all of the arguments advanced by Baker in support of her position, we conclude that nothing in TRIM II precluded the County from adding the additional $.08 to its real property tax rate

to pay principal and interest on the pre-TRIM bonds. In view of our conclusion, we need not concern ourselves with the substantive constitutional law governing the impairment of contracts.[3]

### IV.

Baker's suit against the County was brought pursuant to the guidelines for collusive actions set forth in *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977). Consistent with the principles in *Reyes,* the County informed the Circuit Court for Prince George's County of its need to obtain an expeditious determination respecting its authority to impose a real property tax rate for FY '92 in excess of the $2.40 restriction in § 817B(a)(2) of the charter. As required by *Reyes,* the County obligated itself to pay the counsel fee and litigation expenses of the taxpayer-plaintiff who initiated the action against the County. The court, therefore, appointed counsel to represent Baker. The suit was filed on April 3, 1991, and the County's answer was filed on April 15, 1991.

On May 16, 1991, the date before the case was scheduled for trial, Edna Granahan, a property owner and taxpayer, moved to intervene as a plaintiff. She alleged that because Baker's suit was a collusive one under *Reyes,* her representation by counsel may not be adequate; that no notice was given prior to the filing of the suit to persons who may have had an interest in the case; and there was no showing that the suit presented a justiciable issue.

At the trial on May 17, 1991, counsel for Granahan attributed the late filing of his intervention motion to a number of causes: that he only learned of the suit "sometime" in April by reading about it in a newspaper; that he

---

3. For a thorough review of the framework for determining if governmental action unconstitutionally impairs contractual obligations, *see Board of Trustees v. City of Baltimore,* 317 Md. 72, 562 A.2d 720 (1989); *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 389 A.2d 350 (1978).

was unable to obtain a copy of the pleadings promptly and was otherwise unable to locate the file; that he was on vacation for a week in April; that he did not actually get a copy of the complaint from Baker until sometime prior to April 22; and that while the County's answer was filed on April 15, he was unable to obtain a copy of it until the week before trial.

The trial judge pointed out that the docket entries reflected that he was assigned to the case on April 12; that the County was required by law to set the tax rate by the end of May; and that a great deal of prejudice would adhere to the County if the case were postponed to permit the intervention. The court noted that in *Maryland Radiological v. Health Serv.*, 285 Md. 383, 388–89, 402 A.2d 907 (1979), we fashioned a framework by which trial courts should assess the timeliness of an intervention motion, taking into account the purpose for which intervention is sought; the probability of prejudice to the parties already in the case; the extent to which the proceedings have progressed when the movant applies to intervene; and the reason or reasons for the delay in seeking intervention. The trial court recognized, as we said in *Maryland Radiological*, that "timely application is a prerequisite" to granting of an intervention motion and that "before proceeding to consider the substantive merits of an intervention motion, a trial court should require that the applicant demonstrate the promptness of his request." *Id.* at 388, 402 A.2d 907. Whether it is shown, we said in *Maryland Radiological*, "is dependent upon the individual circumstances of each case and rests in the sound discretion of the trial court, which, unless abused, will not be disturbed on appellate review." *Id.* at 388, 402 A.2d 907.

The trial judge, after carefully considering all of the circumstances, and particularly bearing in mind that the suit was a collusive one and was afforded "fast-track" consideration, concluded that the intervention motion was not timely filed. Granahan appealed from this judgment,

and our grant of certiorari of the County's petition encompassed the merits of Granahan's appeal.

In the circumstances, we find no reason to disturb the exercise of the trial court's determination in denying Granahan's intervention motion. In so concluding, we observe that Baker's legal representation was far more than merely adequate and that Granahan's reasons for failing to file her motion until the day before trial were anything but persuasive. *See also Gardner v. Board of County Comm'rs*, 320 Md. 63, 576 A.2d 208 (1990); *Board of Trustees v. City of Baltimore*, 317 Md. 72, 562 A.2d 720 (1989); *Sornberger v. Chesapeake & Ohio*, 81 Md.App. 14, 566 A.2d 503 (1989); *Ellerin v. Fairfax Sav. Ass'n*, 78 Md.App. 92, 552 A.2d 918 (1989).

JUDGMENT AFFIRMED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.

RODOWSKY, Judge, dissenting.

I respectfully dissent. By striking the levy for fiscal year 1992 at $2.48 Prince George's County (the County), in my opinion, violated TRIM.

In preparing the FY-'92 budget, the County, in effect, put to one side the appropriation required for debt service on pre-TRIM general obligation bonds.[1] It then determined the appropriations for mandated and discretionary programs and projects, other than pre-TRIM debt service, which would balance with anticipated revenues, utilizing a tax rate of $2.40 on the assessable basis.[2] The County then divided the appropriation required for debt service on pre-TRIM bonds into the assessable basis, thereby deriving an "added kicker" of eight cents. The County levied the tax at

---

1. In this dissent the term "bonds" excludes revenue bonds.

2. Md.Code (1986), § 6–302(b)(1) of the Tax–Property Article in part provides that "there shall be a single county property tax rate for all property subject to county property tax." Thus, although TRIM limits only the tax rate on the assessed value of real property in the County, the tax rate for realty and personality must be the same.

$2.48, the total of the two components. Thus, TRIM has been violated as to part of the budget.

The justification for partially ignoring TRIM is said to be the interpretation of TRIM by this Court in *Pickett v. Prince George's County,* 291 Md. 648, 436 A.2d 449 (1981).

*Pickett* was concerned with the conflict between § 827 of the County's charter and TRIM, as adopted in 1978. Under Charter § 827 County bonds contained a declaration that they would " 'be paid by *ad valorem* taxes on real estate and tangible personal property ... without limitation or [sic] rate or amount ... and that the full faith and credit of the County are pledged to such payments.' " *Pickett,* 291 Md. at 660 n. 5, 436 A.2d at 456 n. 5. *Pickett* resolved the apparent conflict between the covenants by the County, made under Charter § 827, and the limitations on the real property tax rate imposed by TRIM I by construing TRIM I prospectively. 291 Md. at 661, 436 A.2d at 456. This prospective interpretation also avoided any constitutional question of impairing the pre-TRIM bonds, as contracts by the County.

Now, more than a decade after TRIM was adopted and almost a decade after *Pickett* was decided, the County takes the position that *Pickett* authorizes a substantial departure from the way executive budgets are prepared under TRIM. *Pickett*'s holding of prospectivity did no more than confirm an earlier opinion of the County Attorney to Moody's Investors Service. That official, in the words of this Court in *Pickett,* "took the position that the charter amendment did not affect these bonds." *Id.* at 660, 436 A.2d at 456. The County Attorney said that TRIM I

" 'may not be applied to impede or restrict the obligation of the County in regard to obligations which were existing prior to [TRIM I] and that the amendment would not prevent the County from raising sufficient revenues by a levy on assessed real and personal property in excess of the constant yield limitation of [TRIM I] in order to pay the principal and interest on the prior outstanding bonds,

*if such remedy were necessary to avoid default, a reve-
nue shortfall, or expected revenue shortfall.' "*
*Id.* at 660, 436 A.2d at 456 (emphasis added). This prospec-
tive operation of TRIM was one reason why this Court said
that there was no foundation for fears of the bondholders in
*Pickett* that had precipitated the suit despite the opinion of
the County Attorney, quoted above. *Id.* at 661, 436 A.2d at
456.

The second reason given why the fears of the *Pickett*
bondholders were without foundation was based on Chapter
796 of the Acts of 1980, now codified as Md.Code (1957,
1990 Repl.Vol.), Art. 31, § 2D. Unfortunately, the meaning
of § 2D is far from clear, and this Court's opinion in
*Pickett,* as a result, suffers from the same defect. In any
event, the conclusion of the second reason given in *Pickett*
why the pre-November 1978 bonds were not impaired by
TRIM was that "[b]y the clear provisions of Art. 31, § 2D
[TRIM] is not applicable to the bonds of the appellants."
*Id.* at 662, 436 A.2d at 457.

It seems to me that § 2D can be read as operating on at
least two levels. The primary level, found in subsection (c),
states the rule of construction to the effect that TRIM shall
not "be construed to impair the obligation ... to levy and
collect taxes to provide for the payment when due of
principal of and interest on bonds ... to which [the County]
has pledged its unlimited taxing power, and which are
outstanding on the effective date [of TRIM]."

It is the interplay between subsections (a) and (c) of § 2D
that generates the lack of clarity. Subsection (a) states a
special rule resolving any inconsistency between TRIM and
the County's pledge of unlimited taxing power in favor of
TRIM. That provision, however, applies only to bonds
issued prior to June 30, 1981, per subsection (d). These
provisions may represent an effort to provide a basis for
severing subsection (c)'s general rule, in the event that it
were held to be limited to prospective operation. If the
general rule of subsection (c) could not be applied retroac-
tively, then the preference given to TRIM over the pledge

of unlimited taxing power by subsection (a) would fill the gap. In any event, the special rule of subsection (a) is itself limited to bonds issued after November 1978 and prior to June 30, 1981, because the first reason for the holding in *Pickett* is that TRIM itself applied only prospectively.

This elaboration on the reasons given in *Pickett* for its holding demonstrates how far removed from that holding is the County's rationale in preparing the FY–'92 budget. In the instant matter the County does not argue factually that the "added kicker" is "necessary to avoid default, a revenue shortfall, or expected revenue shortfall." The County's argument is entirely one of law. Nevertheless, the majority opinion, by a giant leap, applies the narrow holding of *Pickett* to exempt pre-TRIM debt service from the ordinary processes of the executive budget system, and from the special limitation on property tax revenues in that budget imposed by TRIM.

The County's voters in TRIM I and TRIM II have capped the property tax. *Pickett* essentially held that if a legal and economic nightmare should arise the pledge of unlimited taxing power would be given effect as to pre-TRIM bonds. That holding, however, does not justify permitting the County annually and routinely to treat pre-TRIM debt service as an appropriation that exists legally independently of the TRIM cap in the budget process.

Judges ELDRIDGE and McAULIFFE authorize me to state that they join in the views expressed in this dissenting opinion.