18 A.3d 1018

Helen G. NASSIF

v.

Carlton M. GREEN.

No. 1175, Sept. Term, 2009.

Court of Special Appeals of Maryland.

May 2, 2011.

720

Roy I. Niedermayer & Patricia Weaver (Wayne D. Eig, Glenn M. Cooper, Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chartered, on the brief), Bethesda, MD, for appellant.

Walter W. Green & Carlton M. Green, College Park, MD, for appellee.

Panel: EYLER, JAMES R., WOODWARD, and HOTTEN, JJ.

## ON MOTION FOR RECONSIDERATION

EYLER, JAMES R., J.

On March 9, 1993, Walter L. Green (the "decedent") died testate, survived by Helen G. Nassif, his spouse, appellant; Carlton M. Green, his son; and Anne Fotos ("Ms. Fotos"), his daughter. Carlton M. Green was appointed personal representative of the estate. Carlton M. Green, individually ("Mr. Green"), and Carlton M. Green as personal representative of the estate (the "personal representative") are the appellees on appeal.

Appellant elected a statutory share in lieu of taking a bequest under the decedent's will. As the passage of time implies, settlement of the estate has been difficult, because of the complexity of the assets and because of litigation between the parties. This appeal is from a declaratory judgment entered by the Circuit Court for Prince George's County, in which the court ruled on a number of issues relating to the valuation of appellant's statutory share.

We shall reverse in part and affirm in part the circuit court's judgment.

### Factual and Procedural Background

The estate assets, at the time of filing of inventory, and also at the time of filing a federal estate return in June, 1994, were valued at close to $30 million. According to appellees, the estate was complex. We quote from the personal representative's brief.

The four inventories in the Maryland probate estate totaled $28,494,093 and consisted of thirty-five real properties, located in Prince George's County, Montgomery County, Wicomico County and Worcester County; three closely held corporations, which owned real property in Florida and the District of Columbia, owned and operated a motel in Salisbury, Maryland, managed a chicken farm in Salisbury,

Maryland, and owned an undeveloped shopping center site in Bowie, Maryland. At the time of decedent's death he operated a general partnership that owned a 100 room hotel near Busch Gardens in Tampa, Florida; he owned and managed a stock portfolio that consisted of eighty publicly traded corporations; two stock brokerage accounts; he owned and operated a partnership owning fifty (50) subsidized apartments in Elwood, Indiana; and what caused the major problems in this Estate, he owned a 50% interest in a general partnership known aa West Laurel Partnership that owned and operated a 205 room Best Western Hotel and a 37.5% interest in West Laurel Corporation that owned the hotel restaurant in Laurel, Maryland. Other assets in the Maryland Estate consisted of thirteen other partnerships; eighteen separate bank accounts; thirteen escrow accounts; and various mortgages, deeds of trust, and notes receivable. In addition to the Maryland probate estate, the decedent individually owned real property interests in Delaware, Iowa, Florida, Indiana and Pennsylvania which were the subject of ancillary administrations in those states.

Further complicating the administration of this Estate, at the time of the decedent's death, the economy was in the midst of the savings and loan crisis. The Resolution Trust Corporation (hereinafter "RTC") had been appointed receiver of many federal savings banks that failed, including Second National Savings Bank to which decedent had personal liability on outstanding loans exceeding $12 million. Like the savings and loans, the hotel business was suffering. The $4.5 million second trust loan pertaining to the 205 room Best Western Hotel and restaurant in the hotel was in default at decedent's death.

The will, modified by a codicil, contained certain specific bequests;[1] devised one-third of the adjusted gross estate (as defined in ITEM X), to his surviving spouse, appellant, reduced by the value of other property which she received under

---

1. The only bequests at issue are those discussed later in this opinion.

or outside of the will; and devised the rest and residue of the estate to the decedent's children, Mr. Green and Ms. Fotos.

On May 3, 1993, appellant made a timely election to take a statutory share (one third) of the net estate. Maryland Code (1974, 1991 Repl.Vol., Supp.1992), § 3–203 of the Estates and Trusts Article ("ET"). At that time, claims against the estate had to be "presented" within 9 months after the decedent's death. ET § 8–103. Timely claims in the approximate amount of $13 million were presented.[2] Most of the underlying obligations were in the nature of guarantees of loans on which there was a primary obligor. Some of the claims were paid by the primary obligors. Some of the claims were paid by the estate, and the estate was reimbursed by the primary obligors. By 1998, after considerable time and effort in managing the estate assets, the claims were resolved. Approximately $120,000 in claims were paid and not recouped.[3]

As mentioned above, this estate produced extensive litigation in various courts. For our purposes, it is unnecessary to detail the history. The proceedings in the Orphans' Court for Prince George's County produced, *inter alia,* a 2000 opinion and order, which is relevant to the issues before us. In 2000, the personal representative distributed property and/or cash to Mr. Green and Ms. Fotos, to fulfill specific bequests. Specifically, the bequests were a Sunoco gasoline station property, a McDonald's restaurant property, and Nations Bank stock. The personal representative distributed appellant's elective share of the specific bequests, after an order by the orphans' court approving the distribution. Appellant did not appeal from the 2000 decision.

In 2006, the orphans' court ruled on a number of pending issues. Appellees noted a de novo appeal to circuit court from the 2006 decision. That case is still in circuit court and not

2. The total amount of claims filed was approximately $24 million, but there was duplication of claims for the same debt.

3. We are using estimates because the accuracy of the numbers are not in dispute on this appeal.

before us. A copy of the 2006 decision was included in the record extract in this case. Appellees have filed a motion to strike it.

In July, 2006, appellees filed the declaratory judgment action, now before us. In the complaint, appellees alleged that the estate was ready for a final distribution and that the personal representative had calculated the amount of the elective share due appellant. Because a dispute had arisen as to whether it had been calculated properly, appellees sought a declaratory judgment.

The circuit court decided some of the issues on summary judgment, in an opinion and order dated March 28, 2008 and, after a non-jury trial, decided the remaining issues, in an opinion and order dated June 30, 2009.[4]

### Statutory scheme in 1993

In general, the parties agree that the law in effect at the time of decedent's death applies. Instead of property left by a will, a surviving spouse could "elect to take a one-third share of the net estate if there is also a surviving issue...." ET § 3–203. The section did not expressly address the electing spouse's right to receive income from estate assets. Net estate was defined as "the property of the decedent exclusive of the family allowance and enforceable claims against the estate." ET § 1–101(n). The election to take an elective share had to be filed no later than 7 months after appointment of a personal representative under a will. ET § 3–206. An electing spouse could withdraw the election at any time within 30 days after the expiration of time for filing claims against the estate. *Id.* Upon the election of a statutory share, all property which would have passed under the will "shall be treated as if the surviving spouse had died before the execution of the will." ET § 3–208(a). Subsection (b) provided, in part:

---

4. The court filed an amended order on October 28, 2009.

If there is an election to take an intestate share, contribution to the payment of it shall be prorated among all legatees. Instead of contributing an interest in specific property to the intestate share, a legatee may pay the surviving spouse in cash, or other property acceptable to the spouse, an amount equal to the fair market value of the interest in specific property on the date the election to take an intestate share was made by the spouse.

In 1969, the law relating to the administration of estates underwent a substantial change. Since 1993, the date of decedent's death, the law has been amended. Some of the changes are relevant to the issues presented, particularly as they relate to ET §§ 3–203 and 3–208. We shall discuss the relevant statutes in greater detail when we discuss the issues.

### Circuit court decisions

In circuit court, for purposes of calculating the net estate and appellant's elective share, appellees contended that the estate assets should be valued as of the date appellant elected to receive a statutory share. Appellant contended that the assets should be valued as of the date of distribution. The court, on summary judgment, ruled in favor of appellees, relying on legislative history, while observing that the version of ET § 3–203 in effect as of the time of decedent's death did not expressly address the issue.

Appellees also contended that the personal representative could opt to distribute appellant's elective share in cash, pursuant to the version of ET § 3–208(b) in effect as of the time of decedent's death. The personal representative had filed an election to do so on October 11, 2006. Appellant contended she was entitled to distribution in kind. The court, on summary judgment, ruled that the personal representative could pay appellant in cash, noting that the statute contained no time limit for making an election and, given the circumstances of the estate, finding the delay was not unreasonable. The court also noted that appellant was paid in cash when the specific bequests were distributed in 2000.

Appellees contended the 2000 opinion and order by the orphans' court was final and barred appellant from challenging the amount of her distribution as it related to the specific bequests to Mr. Green and Ms. Fotos. Appellant disagreed. The court ruled on summary judgment in favor of appellees.

Appellees contended that the Maryland Uniform Principal and Income Act, enacted in 2000, is not applicable to this estate, *see* Maryland Code (1974, 1991 Repl.Vol., Supp.2000) §§ 15–501 to 15–528 of the Estates & Trusts Article ("ET Supp.2000"), and appellant disagreed. The court, on summary judgment, ruled in favor of appellees.

At trial, the issues were (1) whether the amount of the creditors' claims, as filed, should be considered in calculating appellant's elective share; and, (2) whether appellant was entitled to income on the final distribution of her elective share. After trial, the court ruled that the total amount of the claims, approximately $13 million, is to be included in calculating the net estate and, thus, the elective share, and further ruled that appellant is not entitled to income on the distribution of her elective share.

## Contentions[5]

As summarized by us, appellant contends (1) claims that were timely filed but not allowed and paid were not "enforceable claims" within the meaning of the relevant statute and could not reduce the value of appellant's interest in the estate; (2) the court permitted a double deduction of enforceable claims; (3) appellant is entitled to share in income earned by the estate, and the Uniform Maryland Principal and Income Act applies to income and distributions after Oct. 1, 2000; (4) Mr. Green and Ms. Fotos can not cash out appellant's share pursuant to ET 3–208(b); (5) appellant's challenge to the valuation of specific bequests used to calculate the amount of the elective share is not barred by res adjudicata because of the orphans' court's 2000 opinion and order; and (6) appel-

5. Appellant presents six questions in her brief, which correspond to the contentions.

lant's elective share is to be valued as of the date of distribution.

### Standard of review

■ The standard for appellate review of a trial court's grant of summary judgment is whether the court was legally correct. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990).

The standard for appellate review of a non-jury decision is contained in Maryland Rule 8–131(c). It provides:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■ It is axiomatic that the predominant rule of statutory interpretation is to ascertain the intention of the legislature. In determining that intent, we consider the language of the statute, *Kushell v. Dep't of Natural Resources,* 385 Md. 563, 576–77, 870 A.2d 186 (2005); we analyze the statutory scheme as a whole to determine its specific and broad objectives, *Int'l Ass'n of Fire Fighters, Local 1715 v. Mayor of Cumberland,* 407 Md. 1, 10, 962 A.2d 374 (2008); and, we consider legislative history either to explain or confirm the meaning of language. We give statutes their most reasonable interpretation in light of the above, unless the language in a statute is not clear and unambiguous that it dictates the result.

### Discussion

#### *Enforceable claims*

■ The issues and the analysis overlap. In the order raised by appellant, the first issue is the meaning of "enforceable claims" as used in the definition of "net estate." At the decedent's death, the elective share was one-third of the "net estate." ET § 3–203. "[N]et estate" was defined as "the property of the decedent exclusive of the family allowance and

enforceable claims against the estate...." ET § 1–101(n). The issue before us exists because millions of dollars in claims were filed in this estate, but only a small portion were ultimately paid. The circuit court ruled that enforceable claims meant all valid claims that were filed and that were capable of being enforced, *i.e.*, potentially enforceable against the estate.

Appellant, in essence, argues that enforceable claims is the same as "allowed" claims, meaning claims recognized by the consent of a personal representative or claims which have been reduced to judgment. *See* ET §§ 8–107 and 8–108. An allowed claim is one that will be paid. Appellant points out that the concepts of "enforceable claims" and "net estate" first came into being in 1969, as part of the substantial revision of the law relating to the administration of estates. Appellant observes that, prior to 1969, orphans' courts did not have the power to enforce claims, and that their later ability to do so was part of the 1969 legislation. Appellant notes that the enforcement mechanism contained in ET §§ 8–101, et seq. was consistent with the new orphans' court power. Thus, the use of the term "enforceable claims."

Appellees rely heavily on what they regard as the plain meaning of the statutory language. They argue that enforceable must mean something different from "allowed" or paid. Appellees point out that, under the then existing time-lines, appellant could have withdrawn her notice of elective share after the claims were filed, and taken under the will. Appellees argue that a spouse electing a statutory share is not a residuary heir, impliedly asserting that the concept of an electing spouse is its own category and different from all other categories, or if not, the electing spouse is in the nature of an intestate heir or a specific legatee. In any event, according to appellees, an electing spouse is not entitled to share in income from estate assets during the years of administration.

Appellees also point to the fact that in 2003, the legislature amended the law, including ET § 3–208(b), and while it did not address the subject of claims, the amendment is relevant

to the claims issue. In 1993, and prior to 2003, ET § 3–208(b) provided that, instead "of contributing an interest in specific property to the intestate share, a legatee may pay the surviving spouse in cash, or other property acceptable to the spouse, an amount equal to the fair market value of the interest in specific property on the date the election to take an intestate share was made by the spouse." The 2003 amendment changed the latter portion of the provision to "an amount equal to the fair market value of the interest in the specific property on the date or dates of distribution." Maryland Code (2001 Repl.Vol., Supp.2003) § 3–208(b) of the Estates & Trusts Article ("ET 2001 Repl.Vol.). According to appellees, this is an indication that, prior to 2003, an electing spouse's share was determined as of the time of election, consistent with the assertion that enforceable claims meant claims that were filed and capable of being enforced.

We agree with appellant with respect to the enforceable claims issue. In pre and post 1969, a spouse's share of an estate in intestate succession and a spouse's statutory share, in the event of a will, to the extent pertinent, have been treated in parallel fashion. In pre 1969, Maryland Code (1964 vol.), art. 93, §§ 133–136, provided that a surviving spouse (assuming children) took one third of an intestate estate after payment of all claims and debts of the decedent. The remainder of the assets was referred to as the "surplus." *Id.* at § 133. Similarly, an electing spouse took a dower interest plus one third of the "surplus personal estate." *Id.* at § 329. Dower was the common law right of a surviving widow to a life estate in one third of real estate owned by the decedent. *Silberman v. Jacobs,* 259 Md. 1, 7, 267 A.2d 209 (1970).[6] One difference between pre and post 1969 was that, before 1969, the elective spouse obtained an immediate interest in real estate. art. 93, § 329; *Solis v. Schueneman,* 112 Md.App. 572, 584, 685 A.2d 1181 (1996).

---

**6.** Curtesy was the corresponding right in the husband. *Snyder v. Jones,* 99 Md. 693, 59 A. 118 (1904). In 1969, curtesy and dower were abolished. ET § 3–202.

Prior to 1969, a renouncing spouse had the right to receive income on the original corpus. *Gardner v. Mercantile Trust Co.*, 164 Md. 280, 282, 164 A. 663 (1933); *Mercantile Trust Co. v. Schloss,* 165 Md. 18, 30–31, 166 A. 599 (1933). Prior to 1969, a renouncing spouse had the right to take her share of estate assets in kind, although she did not get possession until distribution. *Hall v. Elliott,* 236 Md. 196, 205, 202 A.2d 726 (1964).

After 1969, Maryland Code (1957, 1969 Repl.Vol.), art. 93, §§ 3–102 and 101, a spouse's share of an intestate estate (assuming children) was one-third of the "net estate." Similarly, an elective spouse's share of a testate estate was one-third of the "net estate." Maryland Code (1957, 1969 Repl. Vol.) art. 93, § 3–203. The calculation of the amount was based on the "net estate" in both instances.

The comment to Maryland Code (1957, 1969 Repl.Vol.) art. 93, § 3–102, states that the section "preserves the proportional distribution to the surviving spouse contained in former §§ 134–137." Similarly, the comment to Maryland Code (1957, 1969 Repl.Vol.), art. 93, § 3–203 states that "the proportional interest of the spouse under former law (§ 329) is retained."

In pre–1969, based on the statutory provisions above, the intestate spouse and the elective spouse received their share after payment of debts and claims. We see nothing in the law to indicate that a change in that scheme was intended by the creation, in 1969, of the concepts of net estate and enforceable claims in the intestate and statutory share context. The concept of net estate was created to deal with the abolition of dower, the merger of real and personal property, and the fact that all assets went to the personal representative with the surviving spouse having no direct interest in the assets. We conclude that enforceable claims means claims that are valid and are required to be paid or paid. While a claim may be potentially enforceable when filed, it is in fact enforceable only when contingencies and conditions are removed and final liability is established.

As a result of this conclusion, the issue relating to a double deduction is moot.

### Date of valuing assets for elective share

■ In 1969, art. 93, § 3–208 came into being. The comment to Maryland Code (1957, 1969 Repl.Vol.), art. 93, § 3–208 provides that subsection (a) is essentially the same as former art. 93, § 329. Subsection (a) requires the renouncing spouse to renounce the entire will and all benefits under it. As to subsection (b), quoted in the last section, the comment provides that it is similar to prior law under which a spouse acquired a proportional interest in each item of property, citing *Hall v. Elliott.* It then provides:

> The prior rule frequently operated to the disadvantage of both the surviving spouse and the other legatees since it created awkward co-ownership of property not readily susceptible of division. In addition, it often worked a hardship in cases such as those where a closely held family corporation was involved. The intention of the testator and the rights of the surviving spouse and other legatees are more properly protected by permitting the legatees to 'redeem' the proportional interest which the spouse might acquire in specific property.

> Such a statutory provision should alleviate the necessity for expensive and time-consuming partition proceedings which do nothing more than achieve the same result.

Based on the statutory scheme before and after 1969, it appears that the reason the language in subsection (b) was added, relating to the ability of a legatee to pay an electing spouse in cash, was to permit the legatee to avoid the problem identified in the comment. The intent was not to change the general scheme with respect to the manner of computation of the distributees' respective interests. Subsection (b) operates only on specific property, not cash, that could be allocated to the elective share. It permits a legatee to retain that property by cashing it out at its value on the date of election. The exercise of the cash out option may be exercised early in estate administration to avoid the problem identified in the

comment. If exercised early, payment will in fact be made, and the spouse can invest those funds or not, as she chooses. The legislature did not intend to change the general scheme, which is that a distributee's interest rises and falls with the change in value of assets and receipt of income and payment of expenses. If the cash out option is not utilized, and interests in specific property are ultimately distributed to the spouse, the value of the spouse's interest, along with the other legatees, rises and falls with the change in value of assets. If the cash out option is exercised, it affects the value of only the asset(s) cashed out.

In the last section, we commented on the amendment to ET § 3–208, in 2003 (in ET 2001, Repl.Vol.). A floor report and a fiscal note relating to the 2003 amendment indicates that the legislature believed it was changing the law. While we do not find that to be especially relevant in determining the intention behind the pre-existing law, it tends to support appellees' interpretation or, at least, does not support appellant's interpretation. We conclude that the legislative history is not sufficient to convince us to not apply the plain language.

We believe the legislature did not contemplate that subsection (b) would be applied many years after the estate had been opened. Nevertheless, the statute does not contain a time limit for exercising the cash out option, and we will not write one into the statute. Moreover, while many years have gone by since the decedent's death, the circuit court concluded that there was no evidence that the personal representative or the legatees acted in bad faith or unreasonably. We see no basis on which to dispute the court's conclusion.

Subsection (b) does not change the general scheme for distribution, only the date of valuation of assets that are cashed out by the legatees by paying the spouse for her interest. Thus, appellant's interest in any undistributed in kind assets should be valued as of the time of distribution or, if cash is paid, valued as of the date of election. Ultimately, the amount to be distributed will be determined after ascertaining the net estate, after payment of expenses and claims.

### Sharing in income

■ At the time of decedent's death, ET § 3–203, provided that a surviving spouse could elect to take a one-third share of the net estate, assuming surviving issue. The section was silent with respect to income earned on estate assets. In 2003, it was amended to provide that an electing spouse is entitled to that portion of the income earned on the net estate during the period of administration based on the one-third share. ET 2001 Repl.Vol., § 3–203.

An electing spouse and an intestate spouse shared in income before 1969. *Gardner, supra.* We see nothing in the language of the statute as it existed in 1993 that convinces us that the legislature intended to change the law, with respect to sharing of income. This result is supported by legislative history, and there is no express language to the contrary. *Frater v. Paris,* 156 Md.App. 716, 727, 848 A.2d 673 (2004) ("Our review of the statute's evolution reveals nothing to suggest that the Legislature, through its amendments, or the Henderson Commission, in its recommendations to the Legislature, intended to change the Maryland law under which the elective share participates in income produced during administration."). Appellant's entitlement to income includes income on a ET § 3–208 payment, up to the date of payment. The amount of income is the amount attributable to the assets that are the subject of the payment. If all assets are cashed out, the amount of income to be paid to the electing spouse by the estate is determined using the same principles.

### Maryland Uniform Principal and Income Act

■ As previously stated, the Maryland Uniform Principal and Income Act was enacted in 2000. The bill, which later became law, stated that it applies to estates existing on the effective date of the enactment (Oct. 1, 2000) "except as otherwise expressly provided in the will ... or under this Act." Ch. 292, 2000 Laws of Md. The Act applies to trusts and estates and "in the case of a decedent's estate," defines a "beneficiary" as including an "heir and legatee," ET 2001 Repl.Vol., § 15–501(c). The terms "heir and legatee" are not

defined in the Act, but those terms are defined at ET Supp. 2000, § 1–101(h) and (m). An " 'heir' is a person entitled to property of an intestate decedent pursuant to §§ 3–101 through 3–110." A " 'legatee' is a person who under the terms of a will would receive a legacy."

Appellees start from the premise that under the law in effect in 1993, appellant was not entitled to income. Appellees observe that, in 2003, the legislature amended ET § 3–203 to expressly provide that an electing spouse was entitled to share in the income. Prior to that time, the section did not expressly address income. At the time of the 2003 amendment, the legislature expressly stated that the amendment was not applicable to an estate of a person who died before October 1, 2003. Therefore, according to appellees, neither the amended ET § 3–203 nor the Act applies to this estate.

Appellees also argue that an electing spouse is neither an heir nor a legatee. Appellees observe that, prior to 1998, Maryland Code (1991 Repl.Vol.), § 3–207 of the Estates & Trusts Article referred to an electing spouse's share as "an intestate share" ("An election to take an intestate share shall be in writing . . . ."), but was amended in 1998 to change "intestate" to "elective." Ch. 748, 1998 Laws of Md. Consequently, appellees conclude that the legislature, when it enacted the Act in 2000, did not regard the electing spouse as taking by intestate succession.

First, as discussed above, we disagree with appellees' premise. Appellant was entitled to share in the income before and after 2003. Second, according to the bill which was enacted in 1998 and which amended ET § 3–207 to change "intestate share" to "elective share," the changes were intended to correct "technical errors." The amendment did not effect a substantive change. Third, we conclude that, for purposes of the Act, the concepts of heir and legatee include an electing spouse. We perceive no intention to exclude electing spouses and no reason to exclude electing spouses from what is intended to be a broad uniform act establishing a default mechanism governing trusts and estates.

Appellees argue that the will expressly provided that the Act should not apply, within the meaning of the bill that became law. Appellees observe that, pursuant to ET § 3–208, "all property or other benefits which would have passed to the surviving spouse under the will shall be treated as if the surviving spouse had died before the execution of the will." ET § 3–208. The will provided that, in the event the decedent was not married at the time of his death, the rest and residue of his estate passed to his surviving children. Consequently, according to appellees, the will expressly provided that the Act should not apply.

We disagree with appellees' argument. Section 15–502 provides, *inter alia*, that a fiduciary shall administer a trust or estate in accordance with the Act "if the terms of the trust or will do not contain a different provision or do not give the fiduciary a discretionary power of administration." In other words, it sets rules that apply by default. The nature of an elective share is that the electing spouse is not taking under the will but rather is paid a statutory determined share by the legatees under the will. The terms of a will or trust govern with respect to distributions under the instruments, but by the very nature of an elective share, a will does not set the terms of an elective share.

Appellees also rely on the 2000 opinion and order by the orphans' court. Appellees argue that the court determined that appellant should receive one-third of the net estate as of the time of filing of her election. The orphans' court order was dated February 18, 2000, prior to the effective date of the Act. Assuming the order is otherwise relevant to this issue, it is not authority for the proposition stated, except as to the specific bequests which were the subject of the order. We shall further address the 2000 opinion and order in the next section.

### Orphans' court 2000 opinion and order

The contention relevant to the 2000 opinion and order is whether appellant can revisit the valuation and distribution of certain specific bequests to the legatees and the corre-

sponding payment for her statutory share of the specific bequests. On January 13, 2000, the orphans' court held a hearing on pending matters. The matters included the personal representative's petition to authorize partial distribution and exceptions to the fifth account. The court recognized that before it were issues relating to valuation and distribution of the Nations Bank stock, the Sunoco gasoline station property, and the McDonald's restaurant property, which were the subject of specific bequests to Mr. Green and Ms. Fotos. The petition recited that the personal representative valued the assets as of the date of election of statutory share, computed one third of that total, and requested authorization to pay that amount in cash to appellant. The court granted the petition and denied appellant's exceptions. Appellant did not appeal.

Appellant again raised the issue in exceptions to the eleventh account. On March 2, 2004, the orphans' court approved the account. The court expressly stated that it intended the order to be a final order. Appellant did not appeal. Appellant accepted the payment of her share attributable to the specific bequests.

We agree with appellees that the orders were final and appealable with respect to the distribution of the specific bequests and cannot be revisited. *See Banashak v. Wittstadt,* 167 Md.App. 627, 656–59, 893 A.2d 1236 (2006).

Moreover, appellant filed a malpractice action against her former counsel, alleging that the 2000 order was final and that she had not been advised of her right to appeal. At trial, at the close of appellant's case, the defendants moved for judgment on the ground that the evidence was insufficient to support a finding that malpractice, if it occurred, caused any loss. The parties treated the orphans' court opinion and order as a final appealable judgment. The circuit court granted the motion and entered judgment in favor of defendants on the ground that damages, if any, were too speculative.

Appellant cannot now take an inconsistent position and re-adjudicate the distribution of the specific bequests and the payment of her share attributable to those bequests. *Stan-*

*dard Fire Insurance Co. v. Berrett,* 395 Md. 439, 456–64, 910 A.2d 1072 (2006). The effect of our decision on this issue is that the valuation and distribution of the specific bequests referred to in the 2000 order and in the fifth and eleventh accounts cannot be revisited. We perceive no binding effect beyond the specific bequests that is relevant to the issues before us.

**APPELLEES' MOTION TO STRIKE PORTION OF RECORD EXTRACT DENIED. JUDGMENT REVERSED IN PART AND AFFIRMED IN PART. COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–FOURTH BY CARLTON M. GREEN AS PERSONAL REPRESENTATIVE, AND ONE–FOURTH BY CARLTON M. GREEN INDIVIDUALLY.**