44 A.3d 321

**Carlton M. GREEN, Personal Representative
of the Estate of Walter L. Green, et al.**

v.

**Helen NASSIF.**

**No. 57, Sept. Term, 2011.**

Court of Appeals of Maryland.

April 20, 2012.

Reconsideration Denied June 21, 2012.

260

Walter W. Green (Law Office of Walter W. Green, College Park, MD), on brief, for petitioner/cross-respondents.

Roy I. Niedermayer (Patricia M. Weaver, Glenn M. Cooper and Wayne D. Eig of Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chtd., Bethesda, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, ALAN M. WILNER (Retired, Specially Assigned), DALE R. CATHELL (Retired, Specially Assigned), JJ.

ADKINS, J.

In this case, we put to an end decades of litigation by a personal representative attempting to secure an unfair portion of a multi-million dollar estate for himself and his sister. The decedent, Walter L. Green, died in 1993. The personal representative, Carlton M. Green, who is also the son of the decedent and a legatee under the will, litigated a number of issues in the orphans' court against the decedent's widow, Helen Nassif. Anticipating an adverse ruling, Green filed a complaint for declaratory judgment in the circuit court, which ruled in his favor. Nassif appealed, and the Court of Special Appeals reversed. Both parties petitioned for *certiorari.*

For the reasons described below, we shall affirm in part, reverse in part, and vacate in part the Court of Special Appeals and hold that (1) "enforceable claims," as used in Maryland Code (1974, 1991 Repl.Vol.), Section 1–101(n) of the Estates and Trusts Article,[1] means claims that in fact reduce the assets in the estate or are allowed by the court; (2) assets

---

1. Unless noted otherwise, all statutory references are to the Estates and Trusts Article of the Maryland Code as it existed in 1993.

in a spouse's elective share are valued, when paid in kind by legatees, as of the date of distribution, and when paid in cash pursuant to Section 3–208(b), as of the date of the spouse's election to take a statutory share; (3) ordinarily, and under the circumstances present here, legatees cannot exercise the option to pay a spouse's elective share in cash 13 years after the decedent's death; (4) elective spouses share in income on assets in the net estate; and (5) there is no justiciable issue in this case regarding the Maryland Uniform Principal and Income Act, Maryland Code (1974, 2001 Repl.Vol.), § 15–501 *et seq.* of the Estates and Trusts Article.

## FACTS AND LEGAL PROCEEDINGS

Walter L. Green ("decedent") died on March 9, 1993, leaving an estate of more than $28 million to his wife, Helen Nassif, and his two children, Anne D. Fotos and Carlton M. Green ("Green"). Instead of receiving her bequest in the Will, Nassif elected on May 3, 1993, to take a statutory share of the estate pursuant to Section 3–206(a). Accordingly, her bequest in the Will, which provided that she would receive a one-third share of the adjusted gross estate less certain expenses, was nullified pursuant to Section 3–208(a).[2]

Green was appointed personal representative ("PR") of the estate, and began settling numerous claims. The estate's assets, and the claims against it, were complex. We quote the Court of Special Appeals' reported opinion, *Nassif v. Green,* 198 Md.App. 719, 722–723, 18 A.3d 1018, 1020–21 (2011), which itself quotes the PR's brief in that court:

> The four inventories in the Maryland probate estate totaled $28,494,093 and consisted of thirty-five real properties, located in Prince George's County, Montgomery County, Wi-

---

**2.** Section 3–208(a) provides:

Upon the election of the surviving spouse to take his intestate share of the property of the decedent, all property or other benefits which would have passed to the surviving spouse under the will shall be treated as if the surviving spouse had died before the execution of the will.

comico County and Worcester County; three closely held corporations, which owned real property in Florida and the District of Columbia, owned and operated a motel in Salisbury, Maryland, managed a chicken farm in Salisbury, Maryland, and owned an undeveloped shopping center site in Bowie, Maryland. At the time of decedent's death he operated a general partnership that owned a 100 room hotel near Busch Gardens in Tampa, Florida; he owned and managed a stock portfolio that consisted of eighty publicly traded corporations; two stock brokerage accounts; he owned and operated a partnership owning fifty (50) subsidized apartments in Elwood, Indiana; and what caused the major problems in this Estate, he owned a 50% interest in a general partnership known as West Laurel Partnership that owned and operated a 205 room Best Western Hotel and a 37.5% interest in West Laurel Corporation that owned the hotel restaurant in Laurel, Maryland. Other assets in the Maryland Estate consisted of thirteen other partnerships; eighteen separate bank accounts; thirteen escrow accounts; and various mortgages, deeds of trust, and notes receivable. In addition to the Maryland probate estate, the decedent individually owned real property interests in Delaware, Iowa, Florida, Indiana and Pennsylvania which were the subject of ancillary administrations in those states.

Further complicating the administration of this Estate, at the time of the decedent's death, the economy was in the midst of the savings and loan crisis. The Resolution Trust Corporation . . . had been appointed receiver of many federal savings banks that failed, including Second National Savings Bank to which decedent had personal liability on outstanding loans exceeding $12 million. Like the savings and loans, the hotel business was suffering. The $4.5 million second trust loan pertaining to the 205 room Best Western Hotel and restaurant in the hotel was in default at decedent's death.

In all, the claims against the estate exceeded $26 million. Many of the larger claims related to loans that the decedent had personally guaranteed, where the primary obligor was a corporation or other business organization in which he had an

interest. Thus, the liability of the estate was conditional and dependent upon the capacity of the business entity to pay the debt.

Green was able to reduce or settle many of the claims, and the estate was ultimately diminished by only $102,869. Nevertheless, he claims that he is entitled, under the law in effect when the decedent died, to deduct $13,204,136 in claims from the estate before calculating Nassif's elective share. The Court of Special Appeals summarized the statutory scheme then in effect:

> In general, the parties agree that the law in effect at the time of decedent's death applies. Instead of property left by a will, a surviving spouse could "elect to take a one-third share of the net estate if there is also a surviving issue. . . ." ET § 3–203. The section did not expressly address the electing spouse's right to receive income from estate assets. Net estate was defined as "the property of the decedent exclusive of the family allowance and enforceable claims against the estate." ET § 1–101(n). The election to take an elective share had to be filed no later than 7 months after appointment of a personal representative under a will. ET § 3–206. An electing spouse could withdraw the election at any time within 30 days after the expiration of time for filing claims against the estate. *Id.* . . . Subsection (b) provided, in part:
>
>> If there is an election to take an intestate share, contribution to the payment of it shall be prorated among all legatees. Instead of contributing an interest in specific property to the intestate share, a legatee may pay the surviving spouse in cash, or other property acceptable to the spouse, an amount equal to the fair market value of the interest in specific property on the date the election to take an intestate share was made by the spouse.
>
> In 1969, the law relating to the administration of estates underwent a substantial change. Since 1993, the date of decedent's death, the law has been amended. Some of the changes are relevant to the issues presented, particularly as they relate to ET [Sections] 3–203 and 3–208. We shall

discuss the relevant statutes in greater detail when we discuss the issues.

*Nassif,* 198 Md.App. at 725–26, 18 A.3d at 1022. We too will later discuss the legislative changes as we examine the issues.

Before distributing Nassif's elective share, Green filed a complaint for declaratory judgment in the Circuit Court for Prince George's County ("Circuit Court"),[3] seeking a declaration that (1) his calculation of enforceable claims totaling in excess of $13 million was correct; (2) those claims were properly deductible from Nassif's statutory share; and (3) Green and Fotos could pay Nassif her statutory share in cash, pursuant to Section 3–208(b)(2), in "an amount equal to the fair market value of the interest in the specific property on the date the election to take an elective share was made by [Nassif]."

When Green filed his complaint for declaratory judgment on July 21, 2006, the estate was already the subject of a pending action in the Orphans' Court for Prince George's County.[4] The two actions proceeded in parallel, and on November 30, 2006, the Orphans' Court issued 117 findings of fact, 23 conclusions of law, and nine orders regarding how the PR should administer the estate. Among its conclusions were that (1) "enforceable claims" were to be calculated as claims "paid as of the date of distribution;" (2) Nassif was entitled to share in income on estate property; (3) the Maryland Uniform Principal and Income Act, Sections 15–501 *et seq.,* applied to distributions and income of the estate; and (4) the legatees' decision to pay Nassif in cash was untimely and void. Green appealed to the Circuit Court, where the case took a different number than the declaratory judgment action.[5]

---

3. Case No. CAL06–14909.

4. Estate No. 40307. Green had filed 14 accounts in the orphans' court, covering the entire administration of the estate since the decedent's death. The parties had also litigated other issues in the orphans' court action that are not before us.

5. The appeal from the Orphans' Court became Case No. CAL07–00997. The declaratory judgment action was Case No. CAL06–14909.

After Green moved for summary judgment in the declaratory judgment action, the Circuit Court partially consolidated the cases on October 23, 2007.[6] On March 28, 2008, the Circuit Court granted in part and denied in part the motion for summary judgment, and the case proceeded to trial.

Following a two-month trial, the Circuit Court issued a memorandum and opinion on June 30, 2009. The court reached different conclusions on the issues that had been decided in the Orphans' Court, holding that (1) $13,204,136 in claims, calculated **before** distribution as claims "capable of being enforced," were properly deductible from the net estate; (2) Nassif was **not** entitled to income on assets in the net estate during the administration of the estate; (3) the Maryland Uniform Principal and Income Act did **not** apply; and (4) there is **no time limit** on a legatee's decision to pay an elective spouse in cash, such that Green and Fotos had **not** delayed unreasonably by deciding on October 11, 2006, and **could** pay Nassif's share in cash, valued as of the **date of her election.**[7]

Nassif appealed to the Court of Special Appeals, arguing that

(1) claims that were timely filed but not allowed and paid were not "enforceable claims" within the meaning of the relevant statute and could not reduce the value of appellant's interest in the estate; (2) the court permitted a double deduction of enforceable claims; (3) appellant is entitled to share in income earned by the estate, and the Uniform Maryland Principal and Income Act applies to income and distributions after Oct. 1, 2000; (4) Mr. Green and Ms.

---

**6.** The court ordered that "only the issues that are the same ... will be consolidated," and "any issues not consolidated ... remain stayed[.]" On or about September of 2009, Nassif moved to lift the stay on the unconsolidated issues in the appeal from the Orphans' Court. The Circuit Court appears to have resolved those issues on June 30, 2010, granting in part Green's motion for summary judgment.

**7.** The court amended its order on October 28, 2009, but did not change these holdings.

Fotos can not cash out appellant's share pursuant to ET 3–208(b); [5] appellant's elective share is to be valued as of the date of distribution.[8]

*Nassif,* 198 Md.App. at 727–28, 18 A.3d at 1023.

The Court of Special Appeals held that (1) "enforceable claims means claims that are valid and are required to be paid or paid," and that the issue of "double deduction" was therefore moot, *id.* at 731–32, 18 A.3d at 1025; (2) an elective spouse shares in income on estate property, even if the legatees decide to pay her statutory share in cash, *id.* at 734–36, 18 A.3d at 1027–28;[9] (3) the Maryland Uniform Principal and Income Act applies, *id.;* (4) there is no time limit on a legatee's decision to pay an elective spouse in cash; *id.* at 733, 18 A.3d at 1026; and (5) assets in the "net estate" are valued as of, (a) for property, the date of distribution, and (b) for cash, the date of the spouse's election to take a statutory share, *id.*[10]

Both parties filed petitions for *certiorari,* which we granted. *In re Green,* 421 Md. 192, 25 A.3d 1025 (2011). In his petition, Green asks the following questions:

(1) As a matter of first impression, what are "enforceable claims" in ET §. 1–101(n) (renumbered § 1–101(p)) and what enforceable claims are to be properly deducted in calculating the net estate for the elective share in this case?

(2) Did the Court of Special Appeals err in holding that the elective share is entitled to income?

---

8. Nassif also raised an issue, which is not before us, relating to a different orphans' court ruling. *See Nassif v. Green,* 198 Md.App. 719, 727–28, 18 A.3d 1018, 1023 (2011).

9. For assets paid in kind, the court held that an elective spouse's share of income is the income on the specific property she receives. *Nassif,* 198 Md.App. at 734, 18 A.3d at 1027.

10. The court ruled in favor of Green on certain issues, not before us, related to a different orphans' court ruling. *Nassif,* 198 Md.App. at 736–38, 18 A.3d at 1028–29.

(3) Does the Principal & Income Act apply to the elective share?

■ In her cross-petition, Nassif asks the following questions: [11]

(1) Did the Court of Special Appeals err in holding that there is no time limit on a legatee's decision to pay a spouse's elective share in cash?

(2) Did the trial court err by allowing certain claims to be deducted twice when calculating the net estate? [12]

---

**11.** We have edited Nassif's questions for clarity. As originally worded, the questions were:

(1) By holding in this case that "the statute does not contain a time limit for exercising the cash out option, and we will not write one into the statute," did the Court of Special Appeals improperly alter the policy of this State, act inconsistently with this Court's decision in *Crystal v. West & Callahan, Inc.*, 328 Md. 318, 614 A.2d 560 (1992), and create confusion concerning Maryland law, as to whether a court should imply a reasonable time requirement when a statute is silent? (2) Is reasonable time for cashing out a widowed spouse under Md.Code Ann., Est. & Trusts § 3–208 measured in relation to notice or actual payment, where only payment and not notice is contemplated by the statute? (3) Did the trial court err by allowing millions of dollars in claims to be deducted twice when calculating the "net estate" for purposes of determining the widowed spouse's statutory share?

**12.** Because Nassif believes the enforceable claims issue is not properly before this Court, she calls this question a "conditional question presented," conditioned upon our decision to address the "enforceable claims" issue. Nassif also argues that Green does not have standing to appeal in his capacity as PR, and therefore that his briefs filed in such capacity should be stricken. Because she did not raise this argument in her opposition to Green's petition for *certiorari* or in her own cross petition for *certiorari*, we shall not address it. *See* Maryland Rule 8–131(b)(1) ("Unless otherwise provided by the order granting the writ of *certiorari*, in reviewing a decision rendered by the Court of Special Appeals ... the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for *certiorari* or any cross-petition[.]"); *Bayly Crossing, LLC v. Consumer Prot. Div.*, 417 Md. 128, 140, 9 A.3d 4, 11 (2010) ("To permit Petitioners, by motion, to ... argue the law regarding a question not raised in the petition for *certiorari* sanctions an end-around maneuver that we ... should not foster[.]"). She is free, however, to contest Green's standing in his capacity as PR in the Orphans' Court, particularly with regard to any fee petition that he may

### The Meaning of "Enforceable Claims"

The amount of Nassif's statutory share depends on the meaning of the statutory term "enforceable claims" in Section 1–101(n). This is because a spouse's statutory share is one third of the net "net estate," which is calculated after all "enforceable claims" are deducted from the gross estate. *See* Sections 1–101(n), 3–203(a)(3). The Court of Special Appeals summarized the parties' positions on the meaning of "enforceable claims":

At the decedent's death, the elective share was one-third of the "net estate." ET § 3–203. "[N]et estate" was defined as "the property of the decedent exclusive of the family allowance and enforceable claims against the estate[.]" ET § 1–101(n). The issue before us exists because millions of dollars in claims were filed in this estate, but only a small portion were ultimately paid. The circuit court ruled that enforceable claims meant all valid claims that were filed and that were capable of being enforced, *i.e.*, potentially enforceable against the estate.

[Nassif], in essence, argues that enforceable claims is the same as "allowed" claims, meaning claims recognized by the consent of a personal representative or claims which have been reduced to judgment. *See* ET §§ 8–107 and 8–108. An allowed claim is one that will be paid. [Nassif] points out that the concepts of "enforceable claims" and "net estate" first came into being in 1969, as part of the substantial revision of the law relating to the administration of estates. [Nassif] observes that, prior to 1969, orphans' courts did not have the power to enforce claims, and that their later ability to do so was part of the 1969 legislation. [Nassif] notes that the enforcement mechanism contained in ET §§ 8–101, et seq. was consistent with the new orphans' court power. Thus, the use of the term "enforceable claims."

file. *See* Allan J. Gibber, *Gibber on Estate Administration* § 7.16 (3rd ed.1991).

[Green and the PR] rely heavily on what they regard as the plain meaning of the statutory language. They argue that enforceable must mean something different from "allowed" or paid. [They] point out that, under the then existing time-lines, [Nassif] could have withdrawn her notice of elective share after the claims were filed, and taken under the will. [They] argue that a spouse electing a statutory share is not a residuary heir, impliedly asserting that the concept of an electing spouse is its own category and different from all other categories, or if not, the electing spouse is in the nature of an intestate heir or a specific legatee.

*Nassif,* 198 Md.App. at 728–29, 18 A.3d at 1023–24. Thus, according to Green, "enforceable claims" means "claims that were filed and capable of being enforced," *Id.* at 730, 18 A.3d at 1024, not "paid" or "allowed" claims.[13]

In support of his position, Green reasons that a spouse's one-month window to elect, following the deadline for claims, shows that the Legislature intended for "enforceable claims" to include all claims capable of being enforced on the date of election. An elective spouse had seven months from the appointment of the PR to elect against the Will, whereas creditors had six months from the decedent's death to file claims, effectively creating a one-month window (sometimes more) for the spouse after the submission of claims. *See* §§ 3–206, 8–103; Chapter 226 of the Acts of 1992. Spouses had this window, according to Green, to evaluate which claims were capable of being enforced, so that they could make informed decisions about whether to take an elective share, exclusive of those claims, or take under the Will.

Green points to the Comments of the Henderson Commission on the original version of this section, Maryland Code (1969), Article 93, Section 3–206,[14] which state that "thirty

---

**13.** Green also argues that whether a claim is "allowed" cannot determine whether it is "enforceable," because typically the PR addresses claims by himself, without involving the orphans' court.

**14.** "The explanations of the Henderson Commission were published as comments to the various sections of former Article 93[.]" *Kann v. Kann,* 344 Md. 689, 715, 690 A.2d 509, 521 (1997).

days after the expiration of the time for filing claims ... will provide sufficient time within which the surviving spouse may make an informed determination whether or not the election should be made[.]"[15] He also cites Gibber, which provides that "[b]efore making an election and, of greater importance, during the extension period, the spouse should be satisfied that he or she has all the relevant information, including the size of the estate, the liabilities against the estate, and the value of his or her share under the will." Allan J. Gibber, *Gibber on Estate Administration* § 9.35 (3rd ed.1991).

Although these sections reference the spouse's window to make a decision, they do not clarify what she is supposed to evaluate during that time. Making an "informed determination" based on the "liabilities against the estate" is just as important if "enforceable claims" means claims that ultimately reduce the estate. The elective spouse would simply need to evaluate the extent to which the claims are likely to reduce the estate. Moreover, under Green's interpretation, spouses would have little to evaluate. Green offers no further definition of "enforceable" beyond "capable of being enforced," which appears to simply require that the claim be timely and in proper form. If this is all that "enforceable" means, then there is hardly a need for spouses to evaluate anything during a 30-day window. They would simply need to check to see that the claims are timely and in proper form.[16]

Green also cites *Winer v. United States*, 153 F.Supp. 941, 943 (S.D.N.Y.1957), which interpreted Section 8.12(b)(3) of the former I.R.S. Code and held that "enforceable claims," as used

---

15. In 1969, spouses had "thirty days after the expiration of the time for filing claims" to elect a statutory share. Md.Code (1957, 1969 Repl. Vol.), Art. 93, § 3–206.

16. Petitioners also cite a 1987 letter from the Attorney General to Judge Peter J. Basilone, which states the Attorney General's opinion that "expenses associated with the administration of the estate" are to be deducted from the net estate. Although Petitioners believe this passage supports their interpretation of "enforceable claims," it is silent on the issue of whether claims must be paid or allowed to be considered enforceable.

in those provisions, includes claims that "would have been allowed" had other conditions been satisfied. He argues that *Winer*'s definition fits the facts of this case, because the claims reduced, settled, or recouped during the administration "would have been allowed" otherwise, and therefore constitute "enforceable claims." The same definition of "enforceable," he points out, is in Webster's Dictionary of Law. *See* Merriam–Webster's Dictionary of Law (1996), *available at* http://dictionary.lp.findlaw.com/dictionary.html (defining "enforceable" as "capable of being enforced esp. as legal or valid"). Finally, he observes that a spouse's right to renounce a will has always been strictly construed in Maryland. *See Barrett v. Clark,* 189 Md. 116, 122, 54 A.2d 128, 131 (1947) ("The right of a surviving husband or widow to renounce the will under the laws of this State has always been strictly construed by this Court."), *superseded by statute on other grounds, as stated in Downes v. Downes,* 158 Md.App. 598, 608, 857 A.2d 1155, 1160 (2004).

Nassif counters that it would be unfair and nonsensical to deduct claims that did not ultimately reduce the value of the estate. This is especially true here, she says, because the PR had a personal stake in reducing the amount of the "net estate" so that he could inherit more as a legatee. Moreover, she argues that under Green's interpretation, the statute's timing would make no sense. If the amount of enforceable claims were set in stone on the date of election, she says, then spouses should elect **before** any claims are filed, thus avoiding even those claims that ultimately **do** reduce the estate; yet this cannot have been the Legislature's intent.

Nassif also points out that *Winer* was overruled by the U.S. Court of Appeals for the Second Circuit in *Comm'r v. Estate of Shively,* 276 F.2d 372, 374–75 (2nd Cir.1960). That case involved a dispute between a personal representative and the IRS over the amount of Federal estate tax owing. The dispute turned on the interpretation of 26 U.S.C.A., Section 812, which defined the "net estate" for purposes of determining the appropriate tax. The gross estate was to be valued as of the date of death of the decedent. *Shively,* 276 F.2d at 374.

Subsection (b)(3) of Section 812 directed that "claims against the estate" be deducted from the value of the gross estate before determining the net estate.[17] The Court framed its task as deciding "what effect the events that occurred here subsequent to decedent's death and prior to the filing of the estate tax return have had upon the amount of permissible deduction from the value of decedent's gross estate under Section 812(b)(3)[.]" *Id.* at 374. The Second Circuit held:

[*Winer* and other cases] stand for the proposition that deductions under Section 812(b)(3) are to be determined without reference to events occurring subsequent to the decedent's death. These cases state that subsequent events are to be ignored even when they render the claim entirely unenforceable in the probate proceeding settling the estate. We disagree with the reasoning of these cases, for we are of the opinion that the rule they announce is incompatible with the purpose Section 812(b) is intended to serve.

Section 812 is entitled 'Net Estate.' Its purpose is to define that portion of the property of a decedent that is subject to estate tax. . . . Obviously this purpose would not be served if a deduction were permitted for claims against an estate which, though having vitality as of date of death, could never be enforced as of the date the estate tax return is filed. The property which might have been subject to such a claim were it enforceable is now certain to pass by way of gift taking effect at death. To permit an estate such a deduction under these circumstances would be to prefer fiction to reality[.]

*Id.* at 374–75.

Neither *Winer* nor *Shively* is directly on point, as we are not interpreting the Federal estate tax law. Yet, we find them analogous because both Section 812(b) of the Internal Revenue Code and Section 3-203 of the Estates and Trusts Article are concerned with deducting claims to arrive at a "net estate" as of a certain date, and the question is whether events

17. Section 812 also called for other deductions.

after that date can be considered in determining the amount of such claims. We have reviewed cases interpreting the Federal law which take a different view,[18] but are inclined to agree with the *Shively* court's analysis that such purpose cannot be served by deducting claims which are ultimately not paid because the PR settles them during administration. To deduct those claims would be "to prefer fiction to reality." *Id.* at 375; *see also Estate of Shedd v. Comm'r,* 320 F.2d 638, 639 (9th Cir.1963) ("Congress did not intend to make events at the date of death invariably determinative in computing the federal estate tax obligation.... And when it appears that the intent of Congress will be served by considering events subsequent to death for this purpose the courts have not hesitated to do so."); *Buck v. Helvering,* 73 F.2d 760, 762 (9th Cir.1934) ("For purposes of appraisement of the estate ... the stockholders' liability should be considered as a potential rather than an actual claim, until it is paid by the estate, or it is reasonably certain that it must be paid.").

Here we have "poster facts" to bolster that reasoning. Green wants to deduct approximately $13,204,136 from the gross estate as claims, most of which were contingent, and reduce Nassif's share by one-third of that ($4,401,378.66) but ultimately pay only $102,869 of the claims, refusing to make any adjustment to the one-third statutory share. Common sense and fair play dictate that we not countenance such machinations.

Moreover, Maryland testamentary law has historically provided that unpaid claims are not deducted from a spouse's elective share. Before the 1969 revisions, Maryland Code (1957, 1964 Repl.Vol.), Article 93, Section 329 provided that an elective spouse took one-third of the "surplus personal estate," which was defined in the comments as "the entire balance of personal estate, principal and income, at the time of distribution[.]" *See also Gardner v. Mercantile Trust Co.,* 164 Md. 280, 283, 164 A. 663, 665 (1933) ("The words 'surplus personal

---

**18.** *See, e.g., Estate of Evelyn M. McMorris v. Comm'r,* 243 F.3d 1254 (10th Cir.2001).

estate' ... mean, we think, the entire balance of personal estate, principal and income, at the time of distribution."). Because the calculation took place at the time of distribution, unpaid claims were not deducted from the elective share, as distribution could not happen until all claims were either paid or allowed. *See* Maryland Code (1957, 1964 Repl.Vol.), Art. 93, § 133 ("Whenever it shall appear ... that all the claims against or debts of the decedent ... have been discharged or allowed ... it shall be [the administrator's] duty to deliver up and distribute the surplus or residue as hereinafter directed[.]"); *see also Kuykendall v. Devecmon,* 78 Md. 537, 542–43, 28 A. 412, 413 (1894) (explaining that an electing widow is entitled to "one-third of the personal estate of her husband ... which shall remain **after payment** of ... just claims against him" (emphasis added) (citations and quotation marks omitted)). Thus, before the 1969 statutory revision, unpaid claims were not deducted from a spouse's elective share.

The 1969 revision explicitly retained the prior method of calculating the spouse's elective share under former Section 329. The comments to Maryland Code (1957, 1969 Repl.Vol.), Article 93, Section 3–203 provided that, "[t]hrough incorporation of the provision of Section 3–102 ['Share of Surviving Spouse'] as determining the amount of the elective share, the proportional interest of the spouse under former law (§ 329) is retained." *See also* Maryland Code (1957, 1969 Repl.Vol.), Art. 93, § 3–102 (providing the method of calculation for a spouse's share, of which the comment states: "This section preserves the proportional distribution to the surviving spouse contained in former §§ 134–137."). Thus, we agree with the Court of Special Appeals that,

> [i]n pre–1969, based on the statutory provisions above, the intestate spouse and the elective spouse received their share after payment of debts and claims. We see nothing in the law to indicate that a change in that scheme was intended by the creation, in 1969, of the concepts of net estate and enforceable claims in the intestate and statutory share

context.... We conclude that enforceable claims means claims that are valid and are required to be paid or paid. *Nassif,* 198 Md.App. at 731, 18 A.3d at 1025.

■ There is nothing in the statute's text or history to suggest that the Legislature intended to upset the historical practice and create an illogical system in which claims may be deducted from the "net estate" even though they do not reduce the value of the estate. We therefore hold that "enforceable claims" means claims that in fact reduce the assets in the estate or are allowed by the court under Section 8–107. We agree with the Court of Special Appeals on this issue and shall remand to that court with directions to remand the case to the Circuit Court for a calculation of enforceable claims consistent with this opinion.

### Valuation and Appreciation of Elective Share Assets

The Court of Special Appeals held that the date on which elective share assets are valued depends on whether the legatees pay the spouse with cash or in kind:

> [Nassif's] interest in any undistributed in kind assets should be valued as of the time of distribution or, if cash is paid, valued as of the date of election. Ultimately, the amount to be distributed will be determined after ascertaining the net estate, after payment of expenses and claims.

*Nassif,* 198 Md.App. at 733, 18 A.3d at 1026. Thus, the court held that an elective spouse shares in the appreciation of assets used to pay the statutory share in kind, but does not share in the appreciation of assets subject to a legatee's decision to pay cash under Section 3–208(b). *Id.*

The Court of Special Appeals observed that, in the typical case, the option to pay cash is exercised early. Nevertheless, it held that, although the Legislature "did not contemplate that [the cash option] would be applied many years after the estate had been opened[, the] statute does not contain a time limit for exercising the cash out option, and we will not write one into the statute." *Id.*

Nassif argues that the Court of Special Appeals erred by not implying a reasonable time limit on the legatees' decision to pay cash under Section 3–208(b). She contends that the legatees' choice in this case was unreasonably late and should not be allowed. The legatees did not even attempt to invoke Section 3–208(b) until October of 2006, she says, when Green filed a motion titled "Election to Pay Surviving Spouse in Cash." The motion stated that the legatees

hereby elect to pay [Nassif] in cash as her elective share of the net estate an amount equal to the fair market value of her interest in the specific property of the Estate valued as of the date the surviving spouse made the election to take an intestate share (May 3, 1993).

She cites a number of cases in which this Court has implied a reasonable time for performance under a statute that does not contain a time limit. *See, e.g., Crystal v. West Callahan, Inc.*, 328 Md. 318, 340, 614 A.2d 560, 571 (1992) ("Absent any clear legislative direction as to the duration of the right . . . it is a traditional exercise of judicial power to fill the statutory interstices by implying a reasonable time within which to act."); *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195, 197 (1962) ("[The statute] states no time limit within which the complaint by a qualified voter to the Election Board must be made, but certainly it is implicit in that statute that the action pursuant thereto must be taken within a reasonable time[.]" (citations and quotation marks omitted)).

Thirteen years after the decedent's death is unreasonable, she says, because it would allow the legatees to select the assets that have appreciated the most and pay Nassif in cash an amount equal to their lower, 1993 values. This would prejudice the elective spouse, she maintains, because if the assets were distributed in kind, they would be valued as of the date of distribution, including their appreciation during the long administration of the estate. As she says, Green's interpretation would allow the legatees to enjoy a "risk free investment," at the spouse's expense, throughout the administration of the estate.

Green, on the other hand, argues that the Court of Special Appeals rightly declined to imply a time limit. He also points out that the legatees exercised the cash option in 1999, not 2006, only six years after the decedent's death. The legatees' timing was reasonable, he says, because they exercised the option "shortly after all the outstanding claims had been satisfied." He also challenges the other part of the Court of Special Appeals' holding, arguing that even if the legatees must pay Nassif's share in kind, the assets should still be valued as of the date of her election. Thus, under Green's interpretation, a delay by the legatees could not prejudice the spouse, no matter how long, because regardless of whether a spouse's share is paid with cash or in kind, the assets would be valued as of the date of the spouse's election.

■ First of all, it is clear that the legatees did not exercise the cash option in 1999. Green points to an August 1999 filing titled "Petition to Authorize Partial Distribution," in which he requested permission to distribute certain specific bequests and pay Nassif "in cash ... representing [her] statutory share." He states that the Orphans' Court approved this petition in February of 2000. Yet the petition only requested authorization to make a "partial distribution" of certain specific bequests that are not before us. As the Court of Special Appeals observed, the February 2000 order had "no binding effect beyond the specific bequests," and neither party appealed from it. *Nassif,* 198 Md.App. at 737–38, 18 A.3d at 1029.[19] The petition also did not mention Section 3–208(b). Thus, Green's reliance on that petition to show that the legatees exercised the option to pay Nassif's entire elective share in cash is misplaced. Green points to no other attempt to exercise the cash option until October of 2006, when he filed the motion titled "Election to Pay Surviving Spouse in Cash." We shall decide if such attempt was unreasonably late as a matter of law.

---

**19.** Nor has either party challenged the Court of Special Appeals' discussion of the February 2000 order.

We have traditionally implied time limits when failing to do so would cause injustice or absurdity. *See Crystal,* 328 Md. at 340, 614 A.2d at 571 ("Implying a reasonable time ... avoid[s] the injustices and potential absurdity of a perpetual right to cancel."); *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1180 (1990) (observing that failing to imply a reasonable time limit would "produce[ ] an absurd and unjust result."); *Parker,* 230 Md. at 130, 186 A.2d at 197 ("What amounts to 'prejudice,' such as will bar the right to assert a claim after the passage of time, depends upon the facts and circumstances of each case[.]").

 Green argues that no injustice or absurdity will result from allowing a legatee to elect to pay cash at a later date, because both cash and in kind assets are valued as of the date of the spouse's election. Indeed, he contends that this is what the Court of Special Appeals held: that the "date of valuation of the elective share ... is the date of election." The Court of Special Appeals, however, clearly held that "in kind assets should be valued as of the time of distribution or, if cash is paid, valued as of the date of election." *Nassif,* 198 Md.App. at 733, 18 A.3d at 1026. Thus, although Green does not believe he is challenging the holding below, his contention that elective share assets are valued as of the date of the spouse's election, even if paid in kind, is clearly contrary to the Court of Special Appeals' decision.[20]

---

**20.** Because neither party raised this issue in a petition for *certiorari,* Nassif argues that it is not properly before us. Green counters that the issue is properly before us because it is "irretrievably intertwined" in the questions presented for *certiorari.* We agree that this issue is necessarily implicated by Nassif's cross-petition, because whether there should be a time limit on a legatee's decision to pay in cash depends on whether such decision will affect the valuation date of the spouse's elective share. *See Walston v. Sun Cab Co., Inc.,* 267 Md. 559, 569, 298 A.2d 391, 397 (1973) ("[W]e will consider on an appeal resulting from a grant of a writ of certiorari only those questions raised in the petition **and matters relevant to those questions**[.]" (emphasis added)). Therefore, we shall decide whether there is a different date of valuation for cash and in kind assets under the 1993 version of the Estates and Trusts Article.

■ Green argues that assets used to pay a spouse's elective share in kind should be valued as of the date of the spouse's election. He points to a law review article written by two members of the commission that drafted the statutory scheme in 1969 (the "Henderson Commission"[21]). *See* Shale D. Stiller & Roger D. Redden, *Statutory Reform in the Administration of Maryland Decedents, Minors, and Incompetents*, 29 Md. L.Rev. 85 (1969). The authors, he says, state that elective share assets are valued as of the date of the spouse's election. He also points to pre–1969 practice, in which heirs and legatees held title to elective share assets during the administration of the estate.[22] Green argues that, because the 1969 statute changed this scheme so that the PR holds title during administration,[23] the Legislature could not have intended for spouses to share in the appreciation of such assets.[24]

Regarding the law review article, the portions cited by Green do not support the interpretation he puts forth. Although the article mentions a spouse's right to share in the appreciation of estate assets, it does so in the context of certain types of bequests contained in the will, not a spouse's election *against* the will. *See* 29 Md. L.Rev. at 99–100. Thus, its discussion of a spouse's right to share in the appreciation of assets has nothing to do with a spouse who elects against the will. Moreover, the portion of the article that does deal with an elective spouse simply explains the cash option, stating that

---

**21.** Formally, the "Governor's Commission to Study and Revise the Testamentary Laws of Maryland." *See* Second Report of the Governor's Commission to Study and Revise the Testamentary Laws of Maryland.

**22.** *See* Comments to Maryland Code (1957, 1969 Repl.Vol.), Art. 93, §§ 1–301, 3–208.

**23.** *See id.;* Section 1–301(a).

**24.** He also argues that, because the elective share is paid by the legatees, not the PR, it is "merely a value," which suggests that it cannot benefit from appreciation. The statute never describes a spouse's elective share as merely a "value," nor does Green cite any other authority for this argument.

"the spouse will no longer be entitled to a proportionate interest, in kind, of each item of property in the estate," because the legatees have the option to pay her share in cash instead. *See id.* at 92. Thus, the law review article does not support Green's position that estate assets, used to pay a spouse's elective share in kind, are valued as of the date of election.

Nor does the statutory scheme, adopted in 1969, according the PR title to the decedent's property during administration, suggest anything about a spouse's right to share in the appreciation of estate assets. The comments of the Henderson Commission on Maryland Code (1957, 1969 Repl. Vol.), Article 93, Section 1–301 explain precisely why the change was made:

> [D]uring the early stages of administration, the heirs or legatees of real estate are frequently not ready to assume the responsibility of managing their property, and as a practical matter, the personal representative is often required to collect the rents, pay taxes and expenses, make repairs, prevent waste and provide insurance coverage for the property. Yet, the personal representative has no ownership interest and may not have even an insurable interest. Furthermore, where the personal representative must take active control of real estate which will pass to heirs or legatees, how are these items to be handled in probate accounting?
>
> \*　　\*　　\*
>
> Another set of problems arises where real estate must be allocated by the personal representative among various outright and trust gifts created under a will. Until the personal representative makes the allocation, the title to real estate really stands in limbo, and there is no way of determining responsibility for its management.
>
> \*　　\*　　\*
>
> In 1925, England solved the problem . . . by making real estate an asset of the probate estate. . . . The same approach has now been adopted in Maryland. . . . Section 1–

301 specifically reflects the fact that the personal represen-
tative has title to and complete power over all of the
"property" of the estate[.]

This reasoning appears again in the Henderson Commission's
comments to Maryland Code (1957, 1969 Repl.Vol.), Article 93,
Section 3–208:

The prior rule frequently operated to the disadvantage of
both the surviving spouse and the other legatees since it
created awkward co-ownership of property not readily sus-
ceptible of division. In addition, it often worked a hardship
in cases such as those where a closely held family corpora-
tion was involved.

* * *

[The new] statutory provision should alleviate the necessity
for expensive and time-consuming partition proceedings[.]

As the Court of Special Appeals observed, the Henderson
Commission's comments make it clear that the 1969 statute
gave title to the PR during administration simply to "avoid the
problem[s] identified in the comment ... not to change the
general scheme with respect to the manner of computation of
the distributees' respective interests." *Nassif,* 198 Md.App. at
732, 18 A.3d at 1026.

Thus, we agree with the Court of Special Appeals that
nothing in the statute suggests that the Legislature intended
to change the traditional rule under which an elective spouse,
when she receives her statutory share in kind, is entitled to
share in the appreciation of the assets she receives. Indeed,
the comments of the Henderson Commission explain that the
1969 law was "similar to that under prior Maryland law by
which the spouse acquired a proportional interest in each item
of property of the decedent." *See* Maryland Code (1957, 1969
Repl.Vol.), Art. 93, § 3–208; *see also* Maryland Code (1888),
Art. 93, § 292 (providing that when a spouse receives her
elective share in kind, she is entitled to one third of the estate
property "which shall remain after payment of ... just
claims[,]" suggesting that such property was not valued at the

time of election, but later, after debts had been paid); *Kuyk-endall,* 78 Md. at 542–43, 28 A. at 413 (same).

Yet when a legatee makes a timely election to pay the spouse in cash rather than with specific property, pursuant to Section 3–208(b)(2), the assets designated are valued on the date of the spouse's election, and the spouse does not share in their appreciation. *See* Section 3–208(b) ("Instead of contributing an interest in specific property to the intestate share, a legatee may pay the surviving spouse in cash . . . an amount equal to the fair market value of the interest in specific property **on the date the election to take an intestate share was made by the spouse.**"(emphasis added)).[25]

▮ Nassif argues that, in light of the different valuation dates for assets paid in kind and assets paid in cash, it would be unjust to allow legatees to exercise the cash option many years after the decedent's death. We agree. As Nassif points out, if such a delay were allowed, the legatees could wait to

---

**25.** As Gibber explains,

> Pursuant to ET § 3–208(b), the payments to the spouse are deemed to be made by the legatee (although not for inheritance tax purposes). As such, the legatee and not the personal representative have the option to determine how to pay the spouse. A legatee may pay to the spouse a proportionate interest of the property received (*e.g.*, 1/3), without computing the increase or decrease in the value of the asset. If, however, a legatee desires to receive his or her full distribution in kind, he or she may pay to the spouse his or her proportionate share of the value of his or her distribution, as determined on the date the election was filed by the spouse.
>
> Assume for example, a legatee was bequeathed 300 shares of ABC Corp. which were valued at $10.00 a share on the date the election was filed. Four months later, when distributions are being made, the stock has gone up to $15.00 a share. If the legatee transfers to the spouse one-third of the stock, the real cost is $1,500. The legatee may opt to pay the spouse in cash, determined by calculating one-third of the value of the assets on the date of filing, or $1,000. If, however, the value of the stock decreased after the filing of the election, the legatee would find it to his or her advantage to pay the spouse in kind.

Gibber, *supra*, § 9.38. In 2003, the Legislature revised Section 3–208(b) to provide that even assets subject to a legatee's decision to pay in cash are valued on the "date or dates of distribution." *See* Chapter 234 of the Acts of 2003.

see which assets appreciate the most during administration and use them to determine the amount payable to the spouse. Because the assets would be valued at their previous, lower values, the spouse would receive far less than what the assets are actually worth. The more the assets appreciate during the administration of the estate, the more the legatees would be benefitted by paying the spouse at their previous, lower values. *See* Gibber, *supra*, § 9.38 ("If ... the value of the stock decreased after the filing of the election, the legatee would find it to his or her advantage to pay the spouse in kind."). This system would effectively allow legatees to pay a spouse less than one-third of the value of the net estate as it exists on the date of distribution.

The Legislature may have intended to create such a system, but it certainly did not contemplate that the period of election would last for 13 years. As the Second Report of the Henderson Commission states, the Legislature intended for distribution to occur within six months, in the typical case. It is safe to say, therefore, that the Legislature did not intend to allow legatees to enjoy their "risk free investment," at the spouse's expense, for more than a decade. Such a scheme would create an absurd and unjust windfall for the legatees, because property values change more drastically over decades than over the course of six months. As we did in *Crystal, Parker,* and *D & Y, Inc.,* we shall infer a reasonable time limit to avoid an absurd and unjust result. Thus, although we affirm the Court of Special Appeals regarding the valuation and appreciation of assets in the spouse's elective share, we reverse that court regarding the timeliness of the legatees' decision to pay cash under Section 3–208(b), holding instead that the legatees' 13–year delay in electing to pay Nassif in cash was unreasonable and shall not be allowed.[26]

---

**26.** Thus, we need not address Nassif's contention that the October 2006 filing failed to satisfy the requirements of Section 3–208(b). Even assuming that the filing was sufficient, it was unreasonably delayed. This holding will have little precedential importance, as it only applies to estates administered under the law as it existed prior to 2003. *See* Chapter 234 of the Acts of 2003 (providing that even assets subject to a

## Income on Elective Share Property

■ The Court of Special Appeals held that a spouse is entitled to income earned on assets in the net estate during the administration of the estate. *Nassif,* 198 Md.App. at 734, 18 A.3d at 1026–27. Green contests this holding for a number of reasons. First, he contends that because the statute does not specifically provide for an elective spouse to share in income, there is no such right. Second, he asserts that the 2003 amendments, which provided that elective spouses would thereafter be entitled to income, show that spouses were not previously entitled to income. Finally, Green argues, given that the statute mentions distributing income to legatees, but does not mention spouses, the Legislature must not have intended for elective spouses to share in income.[27] Nassif counters that the Court of Special Appeals was correct because, prior to 1969, spouses were clearly entitled to income, and nothing in the 1969 revision purported to change this rule.[28]

Prior to 1969, an electing spouse was entitled to income on estate assets. *See Gardner,* 164 Md. at 283, 164 A. at 665 ("[T]he surviving husband or wife shall take ... one-third of the surplus personal estate (if the deceased spouse shall be

legatee's decision to pay in cash are valued "on the date or dates of distribution").

27. Green also argues that (1) Section 9.38 of Gibber, *supra,* uses an example that shows that a spouse is not entitled to income; and (2) the elective share is "merely a value" because it is paid by legatees, not the PR, which suggests that the spouse does not share in income or appreciation. Section 9.38 of Gibber, however, merely shows that spouses are not entitled to share in the *appreciation* of assets subject to a legatee's election to pay in cash under Section 3–208(b). It has nothing to do with income. As for the argument that a spouse's elective share is "merely a value," we observed in the previous section that this argument is baseless, and need not address it again.

28. She also argues that income on elective share assets cannot go to legatees, because Section 7–304(b) provides that they are entitled to income only on their proportionate share of the undistributed property. For the reasons discussed below, we think Section 7–304(b) is not relevant to an elective spouse's rights.

survived by descendants).... The words 'surplus personal estate' ... mean, we think, the entire balance of personal estate, principal **and income,** at the time of distribution." (emphasis added)); *Mercantile Trust Co. v. Schloss,* 165 Md. 18, 31, 166 A. 599, 604 (1933) ("[I]n settlement with the widow or her assignees, they were given one-half of the net estate, excluding therefrom any income received during the year of administration. This was error, [because] where a widow renounce[s], she [is] entitled, there being no children, to one-half of the net estate for distribution, **including income[.]**" (emphasis added)). Thus, Green relies entirely on the position that the 1969 revision stripped a spouse of the right to income on assets in the elective share.

Green argues that, in 2003, the Legislature was explicit in saying that spouses had not been entitled to income under the law as revised in 1969. He again refers to Senate Bill 312 of 2003. This bill added Section 3–203(e)(1), providing that "a surviving spouse who has elected to take against a will shall be entitled to ... income earned on the net estate during the period of administration." Chapter 234 of the Acts of 2003. Green argues that, because the bill stated that its amendments "shall be construed to apply only prospectively[,]" a spouse's right to income on assets in the net estate was not previously part of the statutory scheme. As he points out, the floor report for Senate Bill 312 stated that one of the "most significant changes" in the bill was to "allow the spouse to be paid a proportionate share of the income earned on the net estate during the period of administration." If such a rule had existed previously, he says, it would not have been a "significant change."

As support for this argument, Green selectively quotes a portion of our opinion in *Chesek v. Jones,* in which we observed that "[a]lthough a subsequent legislative amendment of a statute is not controlling as to the meaning of the prior law, nevertheless, subsequent legislation can be considered helpful to determine legislative intent." *Chesek v. Jones,* 406 Md. 446, 462, 959 A.2d 795, 804 (2008). Thus, Green argues that Senate

Bill 312's provision of income for the spouse shows that, previously, legislative intent was to the contrary.

*Chesek* did not hold, however, that an amendment to a statute is evidence that the law was previously different. Indeed, it held the opposite:

> While appellants argue that the failure to expressly provide for delegation in the statute prior to the 2007 amendment indicates that no such delegation power existed previously, legislative intent suggests the contrary.... [T]he legislative history of the 2007 amendment reflects that the purpose of S.B. 384 ... was **clarifying** that the Legislative Policy Committee may delegate its authority to issue subpoenas[.] In addition, the record reflects that the Attorney General's Office testified before the House Rules Committee that the purpose was to **resolve any disputes** over subpoenas and witnesses' refusal to answer questions ... and that the legislation **merely codifies** the ability of the Legislative Policy Committee to delegate its subpoena power. (Emphasis added. Citations and quotation marks omitted.)

*Id.*

■ Similarly, here, we are not convinced that Senate Bill 312 was intended to modify the law with respect to income. As *Chesek* made clear, amendments to a statute that merely "clarify" the law are still significant changes. *See id.* Senate Bill 312 also lists among its "most significant changes" the provision that elective share assets are to be valued "as of the date of distribution, rather than the date of election[.]" Chapter 234 of the Acts of 2003. As we explained above, this was the rule under the prior statute as well, at least for assets paid in kind, although the statutory language was less clear. *See* Maryland Code (1888), Art. 93, § 292; *Kuykendall,* 78 Md. at 542–43, 28 A. at 413; Gibber, *supra,* § 9.38. Thus, in legislative bills, prefatory clauses sometimes characterize as "significant" a language change that merely clarifies an earlier ambiguous statute.

■ Moreover, even if the Legislature believed it was making a substantive change, "a statement by present members of

a legislative body, as to what their predecessors intended in a statute enacted several years previously, is not entitled to much weight." *State v. Coleman,* 423 Md. 666, 683, 33 A.3d 468, 477–78 (2011) (citations and quotation marks omitted); *see also Collier v. Connolley,* 285 Md. 123, 126, 400 A.2d 1107, 1108 (1979) ("[W]e do not place much weight upon what the Legislature, in 1977, said was intended in a 1974 statute."); *Dir. of Fin. for Balt. County v. Myers,* 232 Md. 213, 218, 192 A.2d 278, 280 (1963) (holding that an "amendment . . . is not controlling as to the meaning of the prior law").[29]

■ We are left, then, with Green's contention that Section 7–304(b)'s express provision that income be distributed to "legatees," coupled with its silence regarding elective spouses, implies that elective spouses are not entitled to such income. In 1993, Section 7–304(b) provided:

Unless the will provides otherwise, income from the assets of an estate of a decedent after the death of the testator and before distribution, including income from property used to discharge liabilities . . . shall be distributed as follows:

(1) To specific legatees, the income from the property to which they are entitled, less [certain expenses and sums] . . . [; and]

(2) To all other legatees, except legatees (other than a surviving spouse) of pecuniary legacies not in trust, the balance of the income, less [certain expenses and sums].[30]

Thus, Green argues that, because the definition of "legatee" did not include an elective spouse, elective spouses were not entitled to share in income.

---

**29.** Nor does the 1969 revision, providing that spouses no longer hold title during administration, suggest that the Legislature intended to strip them of income. As we explained above, the comments to Maryland Code (1957, 1969 Repl.Vol.), Article 93, Section 3–208 make it clear that title was given to the PR during administration simply to avoid "awkward co-ownership of property not readily susceptible of division. . . . [The new] statutory provision should alleviate the necessity for expensive and time-consuming partition proceedings[.]"

**30.** This provision was repealed by Chapter 292 of the Acts of 2000.

*Green* asks us to make a negative inference from statutory silence, i.e., that because the Legislature did not mention elective spouses in Section 7–304, it intended to exclude them from sharing in income on estate assets. Were we to read Section 7–304(b) in isolation, we might agree, but we cannot ignore other provisions that undermine Green's argument. *See Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 37 A.3d 972 (2012) ("When, in [a statutory] scheme, two statutes, enacted at different times and not referring to each other, address the same subject, they must be read together, *i.e.*, interpreted with reference to one another, and harmonized, to the extent possible, both with each other and with other provisions of the statutory scheme." (citations and quotation marks omitted)).

Section 7–304 is not in the part of the statutory scheme dealing with an elective spouse's rights. Title 7 is titled "Administration of the Estate," and Subtitle 3 pertains to "Accounting." Title 3, on the other hand, is titled "Intestate Succession and Statutory Shares," and Subtitle 2 pertains to the "Family Allowance and Statutory Share of Surviving Spouse." Thus, looking at the statutory scheme as a whole, it appears at first blush that an elective spouse's rights would be defined in Title 3, not Title 7.

The conclusion that Section 7–304(b) was not intended to define an elective spouse's rights is further confirmed by its first few words, which state: "Unless the will provides other-wise[.]" This phrase clarifies that the provisions of Section 7–304(b) can be overridden by the will, but an elective spouse's rights most certainly cannot be overridden by the will. *See Shimp v. Huff*, 315 Md. 624, 638, 556 A.2d 252, 259 (1989) ("[T]he applicable statutes give a higher priority to a surviving spouse's elective share than to testamentary bequests[.]"); Eugene F. Scoles and Edward C. Halbach, Jr., *Problems and Materials on Decedents' Estates and Trusts* 94 (5th ed. 1993) ("[R]ights in the nature of dower . . . cannot be defeated by will."). Thus, we have further reason to believe that the Legislature did not intend to define an elective spouse's rights in Section 7–304.

Moreover, although the statute is silent as to a spouse's right to income, the law in place when the statute was enacted was not. As mentioned above, our cases were clear that a spouse's elective share was a percentage of "the net estate for distribution, **including income**[.]" *Mercantile Trust,* 165 Md. at 31, 166 A. at 604 (emphasis added); *see Gardner,* 164 Md. at 283, 164 A. at 664–65. The Legislature explicitly preserved this rule when it created the current statutory scheme in 1969. As the Henderson Commission explained, certain proposals were made that

> would have modified the Maryland law with respect to the widow's statutory share. [But t]here seemed to be considerable opposition to this modification . . . and therefore the Commission has decided to **retain the present law.** (Emphasis added.)

Summary of Changes made in Second Report of Governor's Commission to Review and Revise the Testamentary Law of Maryland (Jan. 31, 1969); *see also* Comments to Maryland Code (1957, 1969 Repl.Vol.), Art. 93, §§ 3–203 ("[T]he proportional interest of the spouse under former law . . . is retained."), 3–102 (providing the method of calculation for a spouse's elective share and stating: "This section preserves the proportional distribution to the surviving spouse contained in former §§ 134–137").

Because the Legislature said that it "decided to retain the present law," we affirm the Court of Special Appeals' holding that there is "nothing in the language of the statute as it existed in 1993 that convinces us that the Legislature intended to change the law, with respect to sharing of income." *Nassif,* 198 Md.App. at 734, 18 A.3d at 1027.

### Maryland Uniform Principal and Income Act

 The Court of Special Appeals held that the Maryland Uniform Principal and Income Act, Maryland Code (1974, 2001 Repl.Vol.), § 15–501 *et seq.* of the Estates and Trusts Article, applies to this estate. *Id.* at 734–36, 18 A.3d 1018. Green partially contests this holding, arguing that the Legisla-

ture did not intend to apply the Act to a spouse's elective share. Nassif maintains that the Act applies.

To decide this issue, we must first determine that a justiciable controversy exists. A declaratory judgment shall not issue unless

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

Maryland Code (1973, 2006 Repl.Vol.), § 3-409 of the Courts and Judicial Proceedings Article.

We described this standard in *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 356, 992 A.2d 459, 488 (2010):

A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded. To be justiciable the issue must present more than a mere difference of opinion, and there must be more than a mere prayer for declaratory relief. (Citations and quotation marks omitted.)

█ Part of showing a justiciable controversy is pointing to specific "factual allegations which, under all the circumstances, show that there is a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hamilton v. McAuliffe*, 277 Md. 336, 340, 353 A.2d 634, 637 (1976) (citations and quotation marks omitted); *see also Liss v. Goodman*, 224 Md. 173, 177, 167 A.2d 123, 125 (1961) ("[D]eclarations should not be made where they would not serve a useful purpose or terminate a controversy."); *Staley v. Safe Deposit & Trust Co.*, 189 Md. 447, 456-57, 56 A.2d 144, 149 (1947) ("[C]ourts have some

judicial discretion to refuse a declaratory judgment when it does not serve a useful purpose or terminate controversy.").

In *Hatt v. Anderson,* 297 Md. 42, 45–47, 464 A.2d 1076, 1078–79 (1983), we vacated a declaratory judgment because the plaintiff had failed to point to specific facts that would have been affected by the judgment. Although the parties disagreed about how to interpret a county regulation, they did not identify how their proposed interpretations would have any tangible effect on the case at hand. *See id.* As we explained,

> It may well be that . . . there does exist between Hatt and Klasmeier an actual controversy; antagonistic claims indicating imminent and inevitable litigation; or the assertion and denial of a legal relation, status, right, or privilege. The difficulty confronting us, however, is that if any of these grounds for granting declaratory relief do exist, they are neither disclosed nor apparent from the record before us. The short of it is that nothing appears in the pleadings even remotely suggesting that an actual dispute exists between the parties beyond that which might be implied by the mere facial existence of the regulation; and this alone is plainly insufficient to present a justiciable controversy. . . . There is no indication that Hatt has been ordered to do, or not do, anything under the regulation. . . . It is thus evident that the allegations of Hatt's bill of complaint are simply too theoretical, too abstract and too speculative to form the basis for an action for declaratory relief[.] (Citations and quotation marks omitted.)

*Id.; see also Prince George's County v. Board of Trustees,* 269 Md. 9, 12–13, 304 A.2d 228, 229–30 (1973) (same).

As in *Hatt,* the parties have not shown how the issue presented for our decision—whether the Maryland Uniform Principal and Income Act applies to elective share assets—will affect the case at hand. The Act provides general rules regarding how fiduciaries should identify and manage income on trusts and estates. *See generally* Maryland Code (1974, 2011 Repl.Vol.), § 15–501 *et seq.* of the Estates and Trusts

Article. Green complains that it would be "unfair" to apply the Act, but does not point to any specific facts that would be affected by a decision on this issue. We hold that there is no justiciable controversy at this point regarding the Act's applicability, and shall vacate the opinion of the Court of Special Appeals to the extent that it addresses the Act, with directions to vacate the trial court's declaratory judgment on that issue as well. *See Hatt*, 297 Md. at 47, 464 A.2d at 1079.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AS TO THE MEANING OF "ENFORCEABLE CLAIMS," THE VALUATION AND APPRECIATION OF ESTATE ASSETS, AND THE ELECTIVE SPOUSE'S SHARE OF INCOME; REVERSED AS TO THE TIMELINESS OF THE LEGATEES' DECISION TO PAY CASH; AND VACATED AS TO THE PRINCIPAL AND INCOME ACT. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER.

HARRELL, J., concurs and dissents.

HARRELL, J., *concurring and dissenting.*

I disagree with but a single holding of the majority opinion: that the value of Nassif's elective share distribution should include a pro rata portion of the income generated by the decedent's estate during its administration. Section 3–203 of the Estates and Trusts Article, the governing statute, was silent at the time of the decedent's death in 1993 as to whether an electing spouse was entitled to interest upon distribution of his or her elective share. The principles of statutory interpretation demonstrate forcibly to me that the surviving spouse's elective share at the time of decedent's death was exclusive of estate income. The majority opinion, however, sidesteps this

conclusion, justifying its contrary view with impuissant [1] authority. Although divining legislative intent can be challenging on occasion, the vastly stronger argument in this matter is that Nassif's elective share was exclusive of the decedent's estate income.

A plain reading of Senate Bill 312–2003 militates against the majority opinion's conclusion that Nassif's elective share includes income earned on the estate during its administration. The decedent passed on 9 March 1993. At that time (the determinative point of reference for our purposes), the statute was silent as to entitlement to income in this regard. Senate Bill 312 amended § 3–203 in 2003 to include estate income in a surviving spouse's elective share. This amendment was prospective in effect expressly. Senate Bill 312 provided, "For purposes of this section, a surviving spouse who has elected to take against a will shall be entitled to the surviving spouse's portion of the income earned on the net estate during the period of administration based on a one-third or one-half share, whichever is applicable.... [T]his act shall be construed to apply only prospectively...." 2003 Md. Laws 234. An elementary principle of statutory construction is to give effect to the plain language of a bill. *See, e.g., Md. Ins. Comm'r v. Cent. Acceptance Corp.,* 424 Md. 1, 36, 33 A.3d 949, 970 (2011) (citing *Breslin v. Powell,* 421 Md. 266, 286, 26 A.3d 878, 891 (2011)). A statute so adopted should not be construed to have retrospective effect. *See, e.g., State v. Stowe,* 376 Md. 436, 454, 829 A.2d 1036, 1047 (2003) (quoting *State Tax Comm'n v. Potomac Elec. Power Co.,* 182 Md. 111, 117, 32 A.2d 382, 384 (1943)); *Granahan v. Prince George's Cnty.,* 326 Md. 346, 357, 605 A.2d 91, 96–97 (1992) (citing *Wash. Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.,* 308 Md. 556, 560–64, 520 A.2d 1319, 1321–23 (1987)).

Senate Bill 312 effected a substantive amendment to § 3–203, which supports further that estate income was not included in the elective share in 1993. A substantive amendment to

---

1. Look it up. No need to thank me for improving your word power.

a statute is one that establishes the rights of persons. 1A Norman J. Singer and J.D. Shambie Singer, *Statutes and Statutory Construction*, § 41:4, at 4423 (7th ed.2009) [hereinafter *Statutory Construction*]. Senate Bill 312 was a substantive amendment in this relevant regard because it created for surviving spouses, who elect the statutory share, a right to income generated by the estate during its administration, proportionate to the size of the surviving spouse's elective share. We have observed that "a substantive amendment to an existing statute indicates an intent to change the meaning of that statute." *In re Criminal Investigation No. 1–162*, 307 Md. 674, 689, 516 A.2d 976, 984 (1986) (citations omitted). Further, substantive amendments are presumed to indicate a change in legal rights. *Statutory Construction, supra,* § 22:30, at 355–56. When the Maryland General Assembly amended § 3–203 in 2003 to include in a surviving spouse's elective share a pro rata share of estate income generated during its administration, the presumption is that it did so because it disagreed with (or changed its mind as to) the law as it existed prior to the amendment, and intended to create a new legal right. If including estate income was a new legal right, logically, such a right could not have existed at the time of the decedent's death, which occurred prior to the effective date of the substantive amendment in Senate Bill 312.

The majority opinion circumvents this reasoning by relying on *Chesek v. Jones* for the proposition that a significant statutory amendment does not evince that the statute was construed differently before the amendment. *Chesek*, however, is inapposite. It dealt with a clarifying amendment to a statute, whereas Senate Bill 312 was a substantive amendment, for present purposes. As the majority opinion notes, the purpose of the amendment discussed in *Chesek* was to "resolve any disputes" over subpoena power and to "clarify[ ]" whether that power could be delegated. *Chesek v. Jones*, 406 Md. 446, 462, 959 A.2d 795, 804 (2008). In contrast, the preamble to Senate Bill 312 stated the purpose of the amendment as *"providing* that an elective share includes certain income earned on the net estate during the period of adminis-

tration." 2003 Md. 234 (emphasis added). Further, the floor report for Senate Bill 312 states that one of "the most significant changes" to § 3–203 was "to allow the spouse to be paid a proportionate share of the income earned on the net estate during the period of administration." *Chesek* is unpersuasive in the present matter and does not support the majority opinion's conclusion.

The majority opinion defends further its position that income is included in the elective share in the present case by pointing to two pre–1969 cases. Those cases were superseded, however, in 1969 by Senate Bill 316 of that year. On 24 March 1969, then Governor Marvin Mandel signed into law Senate Bill 316. As the majority opinion notes, the bill repealed, revised, and reorganized the disparate statutes of Maryland estates and trusts law. Shale D. Stiller and Roger D. Redden, *Statutory Reform in the Administration of Estates of Maryland Decedents, Minors and Incompetents*, 29 Md. L.Rev. 85, 85 (1969). When a legislature revises an entire statutory body of law by repealing former statutes and enacting a new statute, "there is a strong implication of legislative intent to repeal former statutory law and also to supersede the common law relating to the same subject." *Statutory Construction, supra,* § 23:13, at 489–90. Therefore, the 1969 amendment, as a substantive and comprehensive revision of Maryland estates and trusts law, rendered inapplicable the antecedent common law relevant to the topic of § 3–203, which itself was revised (but remained silent as to inclusion of income in an elective share). The majority opinion attempts to avoid this construction by quoting selectively from the *Summary of Changes Made in Second Report of Governor's Commission to Review and Revise the Testamentary Laws of Maryland,* noting that " 'with respect to the widow's statutory share . . . the Commission has decided to *retain the present law.*' " op. at 291, 44 A.3d at 340 (2012). This partial quotation shared with us by the majority opinion is inapposite and misapplied because, when reviewing the full quotation in context, one discovers that it refers to § 3–102 of the Estates and

Trusts Article, which governs a surviving spouse's *intestate share,* not an *elective share.*

For these reasons, income generated by the deceased's estate during its administration should be excluded from Nassif's elective share.